## VILLAGE OF EUCLID ET AL. *v.* AMBLER REALTY COMPANY.

### APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO.

No. 31. Argued January 27, 1926; reargued October 12, 1926.— Decided November 22, 1926.

1. A suit to enjoin the enforcement of a zoning ordinance with respect to the plaintiff's land, need not be preceded by any application on his part for a building permit, or for relief under the ordinance from the board which administers it, where the gravamen of the bill is that the ordinance of its own force operates unconstitutionally to reduce the value of the land and destroy its marketability, and the attack is not against specific provisions but against the ordinance in its entirety. P. 386.

2. While the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. P. 386.

3. The question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined by considering the building or the thing, not abstractly but in connection with the circumstances and the locality. P. 387.

4. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. P. 388.

5. No serious difference of opinion exists in respect of the validity of laws and regulations fixing the height of buildings within reasonable limits, the character of materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of over-crowding, and the like, and excluding from residential sections offensive trades, industries, and structures likely to create nuisances. P. 388.

6. The same power may be extended to a general exclusion from residential districts of all industrial establishments, though some may not be dangerous or offensive; for the inclusion of a reasonable margin to insure effective enforcement will not put upon a law, otherwise valid, the stamp of invalidity. P. 388.

7. The power to relegate industrial establishments to localities separate from residential sections is not to be denied upon the ground that its exercise will divert a flow of industrial development from the course which it would follow and will thereby injure the complaining land-owner. P. 389.

8. The police power supports also, generally speaking, an ordinance forbidding the erection in designated residential districts, of business houses, retail stores and shops, and other like establishments, also of apartment houses in detached-house sections—since such ordinances, apart from special applications, can not be declared clearly arbitrary and unreasonable, and without substantial relation to the public health, safety, morals, or general welfare. P. 390.

9. Where an injunction is sought against such an ordinance, upon the broad ground that its mere existence and threatened enforcement, by materially and adversely affecting values and curtailing the opportunities of the market, constitute a present and irreparable injury, the court, finding the ordinance in its general scope and dominant features valid, will not scrutinize its provisions, sentence by sentence, to ascertain by a process of piecemeal dissection whether there may be, here and there, provisions of a minor character, or relating to matters of administration, or not shown

to contribute to the injury complained of, which, if attacked sepa-
rately, might not withstand the test of constitutionality. P. 395.
297 Fed. 307, reversed.

APPEAL from a decree of the District Court enjoining
the Village and its Building Inspector from enforcing a
zoning ordinance. The suit was brought by an owner of
unimproved land within the corporate limits of the vil-
lage, who sought the relief upon the ground that, because
of the building restrictions imposed, the ordinance oper-
ated to reduce the normal value of his property, and to
deprive him of liberty and property without due process
of law.

*Mr. James Metzenbaum* for the appellants.

The police power is very wide, *C. B. & Q. Ry.* v. *Drain-
age Commrs.*, 200 U. S. 561; *Munn* v. *Illinois*, 94 U. S.
113, and adequate to meet new conditions, *Bacon* v.
*Walker*, 204 U. S. 317; *Hadachek* v. *Los Angeles*, 239 U. S.
394; *Sligh* v. *Kirkwood*, 237 U. S. 52; *Barbier* v. *Connolly*,
113 U. S. 27; *Gundling* v. *Chicago*, 177 U. S. 183; *Bank* v.
*Haskell*, 219 U. S. 104. Legislation under it is presump-
tively legal. *Sinking Fund Cases*, 99 U. S. 718; *Powell* v.
*Penn*, 127 U. S. 684. Courts will not assume the function
of the legislative branch, *Barbier* v. *Connolly, supra.* To
be unconstitutional, the legislation must have no relation
to health and welfare. *Cusack Co.* v. *Chicago*, 242 U. S.
526; *Salt Lake City* v. *Foundry Co.*, 55 Utah 452; *State* v.
*Withnell*, 91 Neb. 513; *Armour & Co.* v. *North Dakota*,
240 U. S. 510. Unconstitutionality must be plainly and
palpably clear. *Jacobson* v. *Massachusetts*, 197 U. S. 11;
*Cusack Co.* v. *Chicago, supra.* The law must be plainly
and manifestly unreasonable, *Cusack Co.* v. *Chicago,
supra; Porter* v. *Wilson*, 239 U. S. 170. Illegality must be
clearly established, *Sinking Fund Cases, supra; Powell* v.
*Pennsylvania*, 127 U. S. 678; *People* v. *Warden*, 216 N. Y.
154; *People* v. *Schweinter Press*, 214 U. S. 395. Financial

loss is not the test, *Hadachek* v. *Los Angeles,* 239 U. S. 394; *United States* v. *Noble,* 237 U. S. 78; *Reimman* v. *Little Rock,* 237 U. S. 171; *Erie R. R. Co.* v. *Williams,* 233 U. S. 700; *Mugler* v. *Kansas,* 123 U. S. 623; *Sheehan* v. *Scott,* 145 Cal. 684; *Cochrane* v. *Preston,* 108 Md. 220; *State* v. *Cunningham,* 97 Oh. St. 130; *Biggs* v. *Steinway,* 229 N. Y. 320. Local conditions must be considered, *McLean* v. *Denver,* 203 U. S. 38; *Ohio Co.* v. *Indiana,* 177 U. S. 190; *Affeld* v. *N. Y. Co.,* 198 U. S. 361; *Welch* v. *Swasey,* 214 U. S. 91; *Pleasay* v. *Ferguson,* 163 U. S. 537; *Brown* v. *Walling,* 204 U. S. 320.

Though there is unquestionably a " taking " under the exercise of police power, yet that taking is not such as is inhibited by or as requires compensation under the Constitution. This view is recognized in the case of *Interstate Ry. Co.* v. *Commonwealth,* 207 U. S. 79. See also *Hadachek* v. *Los Angeles,* 239 U. S. 394; *Welch* v. *Swasey,* 214 U. S. 91; *Cochrane* v. *Preston,* 108 Md. 220; *Publicity Co.* v. *Supt. of Building,* 218 N. Y. 540; *Doan Co.* v. *Cleveland,* 97 Oh. St. 130; *Barbier* v. *Connolly,* 113 U. S. 27. Classification is permitted and even necessary. *C. & N. W. Ry.* v. *R. R. Comm.,* 280 Fed. 394; *Welch* v. *Swasey, supra; Hadachek* v. *Los Angeles, supra; Powell* v. *Pennsylvania,* 127 U. S. 678.

The courts will not substitute their judgment for that of the legislature. *Armour & Co.* v. *North Dakota,* 240 U. S. 513; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Benson* v. *Henkel,* 198 U. S. 1; *Cusack* v. *Chicago,* 242 U. S. 526; *Salt Lake City* v. *Foundry Works,* 55 Utah 447; *C. B. & Q. R. R.* v. *Haggarty,* 67 Ill. 113; *Central R. R.* v. *Pettus,* 113 U. S. 127. The general application and not one single instance must be the guide. *Rochester* v. *West,* 164 N. Y. 510; *Tenement House Dept.* v. *Moeschen,* 179 N. Y. 325; *St. Louis Poster Co.* v. *St. Louis,* 249 U. S. 269; *Pierce Oil Corp.* v. *Hope,* 248 U. S. 500; *Benz* v. *Kremer,* 142 Wis. 1.

On the validity of the provisions of the ordinance concerning the Board of Appeals, see *People* v. *Board of Appeals,* 234 N. Y. 484; *Welch* v. *Swasey,* 214 U. S. 91; *Ayer·* v. *Cram,* 242 Mass. 30; *Broadway Co.* v. *Nulle,* 203 App. Div. 468; *Sanders* v. *Walsh,* 108 Misc. 193; *Mutual Film Co.* v. *Industrial Comm.,* 236 U. S. 230; *Presbyterian Church* v. *Edgcomb,* 109 Neb. 18; *Chicago R. R. Co.* v *R. R. Comm.,* 280 Fed. 387; *Merrick* v. *Halsey & Co.,* 242 U. S. 590.

The constitutionality of comprehensive zoning ordinances was involved in the following cases:

New York, (favorable): *Lincoln Trust Co.* v. *Williams· Corp.,* 229 N. Y. 313; *People* v. *Board of Appeals, supra; In re Russell,* 158 N. Y. Supp. 162; *People* v. *Ludwig,* 218 N. Y. 240; *Barker* v. *Switzer,* 209 App. Div. 151; *Wulfsohn* v. *Burden,* 241 N. Y. 288.    Massachusetts, (favorable): *Building Inspector* v. *Stoklosa,* 250 Mass. 52; *Spector* v. *Milton,* 250 Mass. 63; *Brett* v. *Building Commissioner,* 250 Mass. 73; *Welch* v. *Swasey,* 193 Mass. 364, affd. 214 U. S. 91; *Parker* v. *Commonwealth,* 178 Mass. 199; *Attorney General* v. *Williams,* 174 Mass. 476; *Ayer* v. *Cram,* 242 Mass. 30.    New Jersey decisions at least partially opposed are: *State* v. *Nutley,* 99 N. J. L. 389; *Handy* v. *South Orange,* 118 Atl. 838; *Ignaciumas* v. *Risley,* 98 N. J. L. 712; *Max* v. *Building Inspector,* 127 Atl. 785; *Schaite* v. *Senior,* 97 N. J. L. 390; *Cliffside Park Co.* v. *Cliffside,* 96 N. J. L. 278.    Maryland, (opposed): *Goldman* v. *Crowther,* 147 Md. 282.    Missouri, (opposed): *St. Louis* v. *Evraiff,* 301 Mo. 231; *State* v. *McKelvey,* 256 S. W. 495. Texas: *Spann* v. *Dallas,* 111 Texas 350, is not properly a zoning case.    But see *Dallas* v. *Mitchell,* 245 S. W. 944. California, (favorable): *Miller* v. *Board,* 195 Cal. 477; *Zahn* v. *Board,* 195 Cal. 497.    Cf. *Hadachek* v. *Los Angeles,* 239 U. S. 394; *Ex parte Quong Wo,* 161 Cal. 220. Kansas, (favorable): *Ware* v. *Wichita,.* 113 Kan. 153; *West* v. *Wichita,* 118 Kan. 265.    Iowa, (favorable): *Des*

*Moines* v. *Manhattan Oil Co.,* 193 Iowa 1096. Louisiana, (favorable): *Calvo* v. *New Orleans,* 136 La. 480; *State* v. *New Orleans,* 142 La. 73; *Civello* v. *New Orleans,* 154 La. 271. Connecticut, (favorable): *Whitney* v. *Windsor,* 95 Conn. 357. District of Columbia, (favorable): *Schwartz* v. *Brownlow,* 50 App. D. C. 279. Minnesota, (favorable): *Banner Grain Co.* v. *Houghton,* 297 Fed. 317; *Twin City Co.* v. *Houghton,* 144 Minn. 1; *Beery* v. *Houghton,* 164 Minn. 146. Wisconsin, (favorable): *Carter* v. *Harper,* 182 Wis. 148; *Holzbauer* v. *Ritter,* 184 Wis. 35. Ohio, (favorable): *Perrysburg* v. *Ridgway,* 108 Oh. St. 245; *Morris* v. *Osborn,* 22 Oh. N. P. (N. S.) 549; *Youngstown* v. *Kahn Bros.,* 112 Oh. St. 654; *Bolce* v. *Hauser,* 111 Oh. St. 402.

See also: *Stephens.* v. *Providence,* (not yet officially reported), 133 Atl. 614; *Wood* v. *Boston,* (not yet officially reported), 152 N. E. 62; *Deynzer* v. *Evanston,* 319 Ill. 226; *Aurora* v. *Burns, Id.* 84; *Fourcade* v. *San Francisco,* 196 Cal. 655; *State* v. *New Orleans,* 159 La. 324; *Bradley* v. *Board of Zoning Appeals,* (not yet officially reported), 150 N. E. 892.

The Ambler Company—without any application for revision, amendment or modification of the ordinance and without desiring to build any kind of structure whatsoever—hastened into court and applied for an injunction against the enforcement of the ordinance or any part of it. The decree struck down the entire ordinance. Under the conditions, the Company neither then had nor has now the right to bring into issue any question other than that the ordinance is fundamentally and *per se* in violation of the federal and state constitutions.

Until the complainant shall at least have applied for a permit to build some kind of structure, and until such permit shall have been denied, the complainant does not have the right to obtain an injunction upon the ground that the ordinance is unreasonable in its effect upon the property in question.

*Mr. Newton D. Baker,* with whom *Mr. Robert M. Morgan* was on the brief, for the appellee.

The recent industrial development of the City of Cleveland, following the railroad lines, has already reached the Village and to some extent extends over into it. In its obvious course, this industrial expansion will soon absorb the area in the Village for industrial enterprises. It is in restraint of this prospect that the ordinance seeks to operate. In effect it erects a dam to hold back the flood of industrial development and thus to preserve a rural character in portions of the Village which, under the operation of natural economic laws, would be devoted most profitably to industrial undertakings. This, the evidence shows, destroys value without compensation to the owners of lands who have acquired and are holding them for industrial uses.

Since the industrial development of a great city will go on, the effect of this attempted action necessarily is to divert industry to other less suited sites, with a consequent rise in value thereof; so that the loss sustained by the proprietors of land who cannot so use their land is gained by proprietors of land elsewhere. In other words, the property, or value, which is taken away from one set of people, is, by this law, bestowed upon another set of people, imposing an uncompensated loss on the one hand and a gain which is arbitrary and unnatural on the other hand, since it results, not from the operation of economic laws, but from arbitrary considerations of taste enacted into hard and fast legislation. Such legislation also tends to monopolize business and factory sites.

In the argument below it is alleged, that the Company could have no matured right of action until it had first made application for a permit as to specific proposed uses of its lands, taken appeals from refusals to grant such permit, and filed petition with the council of the Village for such amendments as it might deem necessary.

The wrong done to the plaintiff below was done when the ordinance was passed and continues as long as the ordinance is in existence. Prospective purchasers of land for commercial and industrial development will not even consider the plaintiff's land so long as the ordinance is in existence. To require the plaintiff to wait until he can find a purchaser sufficiently brave and sufficiently patient to buy a site in the teeth of this ordinance, bear the cost and delay of preparing plans, applying for a permit and having it rejected, perfecting an appeal and having it denied, and then exhausting the possibilities of petitions for amendment of the ordinance which would permit the proposed use, would, in fact, deprive the plaintiff of any remedy whatever, for no such complaisant purchasers can be found in a competitive real estate market. The plaintiff and others similarly situated with regard to their lands would simply be required to sit still and see the normal industrial and commercial development diverted, as purchasers passed them by and took less desirable land, free from the necessities of protracted litigation, in preference to the lands in the Village of Euclid, each acre of which would require litigation and lobbying before it could be devoted to entirely lawful and normal uses.

Ordinance No. 2812 is penal in character. That a court of equity will enjoin the enforcement of a void statute where the legal remedy is inadequate is no longer open to question, in view of the decisions of this Court. *Kennington* v. *Palmer*, 255 U. S. 100; *United States* v. *Schwartz, Id.* 102; *Adams* v. *Tanner*, 244 U. S. 590; *Truax* v. *Raich*, 239 U. S. 33; *Bloch* v. *Hirsch*, 256 U. S. 135; *Brown Holding Co.* v. *Feldman*, 256 U. S. 170.

Whether Ordinance No. 2812 rests for its authority upon the "power of local self-government" granted by § 3 of Art. XVIII of the Ohio Constitution, or upon the attempted donation of power to municipal corporations by §§ 4366–1 to 4366–12 of the General Code, the same

tests must be applied to its validity, and those tests are whether or not that ordinance is a reasonable and real exercise of the police power or an unreasonable and arbitrary exercise of the powers of local self-government and an impairment of the rights of property guaranteed to the plaintiff by the constitutions of the United States and of Ohio.

The ordinance does not, in fact, pursue any rational plan, dictated by considerations of public safety, health and welfare, upon which the police power rests. On the contrary, it is an arbitrary attempt to prevent the natural and proper development of the land in the Village prejudicial to the public welfare. This property in the interest of the public welfare, should be devoted to those industrial uses for which it is needed and most appropriate. Therefore, while it will be necessary for us to discuss " zoning " and point out what we believe to be the point of collision between the so-called zoning power and the Constitution of the United States, the appellee's primary interest is to protect its property against the damage wrought by this particular ordinance.

That municipalities have power to regulate the height of buildings, area of occupation, strengths of building materials, modes of construction, and density of use, in the interest of the public safety, health, morals, and welfare, are propositions long since established; that a rational use of this power may be made by dividing a municipality into districts or zones, and varying the requirements according to the characteristics of the districts, is, of course, equally well established. We believe it, however, to be the law that these powers must be reasonably exercised, and that a municipality may not, under the guise of the police power, arbitrarily divert property from its appropriate and most economical uses, or diminish its value, by imposing restrictions which have no other basis than the momentary taste of the public authorities.

Nor can police regulations be used to effect the arbitrary desire to have a municipality resist the operation of economic laws and remain rural, exclusive and aesthetic, when its land is needed to be otherwise developed by that larger public good and public welfare, which takes into consideration the extent to which the prosperity of the country depends upon the economic development of its business and industrial enterprises.

The municipal limits of the Village of Euclid are, after all, arbitrary and accidental political lines. The metropolitan City of Cleveland is one of the great industrial centers of the United States. If the Village may lawfully prefer to remain rural and restrict the normal industrial and business development of its land, each of the other municipalities, circumadjacent to the City of Cleveland, may pursue a like course. Thus the areas available for the expanding industrial needs of the metropolitan city will be restricted, the value of such land as is left available artificially enhanced, and industry driven to less advantageous sites. All this would be done at the expense of those land owners whose lands, being most advantageously located from an industrial point of view, have as a part of their right of property, which the constitutions of the Nation and the States undertake to protect, the expectation of value due to their superior availability for industrial development. *Kahn* v. *Youngstown,* 113 Oh. St. 17; *Pritz* v. *Messer, Id.* 89.

The distinction between the power of eminent domain and the police power is important. In the first place, there must be a public need, the property proposed to be taken must be taken for a public use, all the forms of law must be observed in the taking, and the private owner ultimately compensated. The courts do not allow the private owner to argue with the legislative authority in the exercise of its discretion as to what is a public need and his opinion is not important in the definitions

of a public use, but the books are full of cases in which the exercise of this power has been stayed, even against the legislative determination, where the proposed use was only colorably public and the plain purpose of the appropriation was private advantage, no matter how widely distributed. Even where the owner is to be fully compensated, his right to retain and use his own property is protected unless there is a real, as against a pretended, public need to take it and use it.

"Quite different is the police power under which the ordinance in this case purports to be passed. In every ordered society the State must act as umpire to the extent of preventing one man from so using his property or rights as to prevent others from making a correspondingly full and free use of their property and rights. The abstract right of a man to build a fire trap is limited by the rights of other people not to have their houses subjected to the peril created by it. The right of a man to maintain a nuisance on his own property is limited by the rights of others not to be subjected to the danger of its proximity. Accordingly, the so-called police power is an inherent right on the part of the public umpire to prevent misuses of property or rights which impair the health, safety, or morals of others, or affect prejudicially the general public welfare.

The limitations imposed by the police power do not have to be compensated for, for the reason that they are inherent in the ownership. If I buy a piece of land I have no means of knowing whether or not it will be needed for the public use, and if any need develops, I must be compensated when the public takes it. But I always know when I buy land, that I may not devote it to uses which endanger the safety, health, or morals of others or make its use a common nuisance to the prejudice of the public welfare. Because of its nature, the exercise of the

police power has always been restrained to those uses of property which invade the rights of others, and courts consistently decline to permit an extension of the police power to uses of property involving mere questions of taste or preference or financial advantage to others. Unless the theory of our expanding civilization is wrong, the public welfare is advanced by the devotion of the most available sites to business and industry, as the need for them develops. Restrictions upon limited areas have always been established, when desired, by mutual contracts, and such restrictions have been upheld so long as they were reasonable, in view of the changing growth and development of the country. It has, however, only recently been suggested that use restrictions, which formerly lay in contract, may be imposed or abrogated by municipal regulation and that the fleeting legislative judgment and will of a municipal council can select which, out of a variety of admittedly innocent uses, it will permit the owners of land to enjoy. *Yates* v. *Milwaukee,* 10 Wall. 497.

Even if the world could agree by unanimous consent upon what is beautiful and desirable, it could not, under our constitutional theory, enforce its decision by prohibiting a land owner, who refuses to accept the world's view of beauty, from making otherwise safe and innocent uses of his land. The case against many of these zoning laws, however, is much stronger than this. The world has not reached a unanimous judgment about beauty, and there are few unlikelier places to look for stable judgments on such subjects than in the changing discretion of legislative bodies, moved this way and that by the conflict of commercial interests on the one hand, and the assorted opinions of individuals, moved by purely private concerns, on the other.

Perhaps the most often quoted definition of the police power is that of Judge Cooley. Constitutional Limita-

tions, 7th ed., p. 245. This limits the power to the establishment of rules to prevent the conflict of rights. See also, *Id.* 768, 839; *Truax* v. *Corrigan,* 257 U. S. 336; *People* v. *Road,* 9 Mich. 285; Tiedeman, State and Federal Control, § 146; Freund, Police Power, § 511. *Munn* v. *Illinois,* 94 U. S. 113, sustained the police power in the regulation of grain elevators, because such property was held to be affected with a public use, but the court sharply declined to regard the rule then established as an invasion of rights purely private. See also *Coppage* v. *Kansas,* 236 U. S. 1; *Wolf Packing Co.* v. *Court of Industrial Relations,* 262 U. S. 522; 267 *Id.* 552; *Penna. Coal Co.* v. *Mahon,* 260 U. S. 393; *Eubank* v. *Richmond,* 226 U. S. 137.

It has not been difficult for this Court to vindicate the great guaranties of the Constitution against direct attack. The trouble comes when these guaranties of individual rights of liberty and property appear to stand in the way of some genuinely benevolent and praiseworthy object which enlists support or enthusiasm, and when only a little infringement of the right of the individual is asked to be indulged. Yet the danger of frittering away the constitutional guaranties by successive encroachments has always been apparent. *Railway Co.* v. *Commissioners,* 1 Oh. St. 77; *Miller* v. *Crawford,* 70 Oh. St. 207; *Williams* v. *Preslo,* 84 Oh. St. 345; *Coppage* v. *Kansas,* 236 U. S. 1; *Boyd* v. *United States,* 116 U. S. 616.

It is impossible to reconcile the rulings of the supreme courts of the States upon the questions here presented. Each case is, of course, decided on its own facts. Many of them presented familiar restrictions, more or less demonstrably involving the public safety, health, or morals. In some of the cases, although the opinions seem to sanction very wide extensions of the traditional police power, the facts involved do not necessitate the width of the rulings; but even this consideration does

not make it possible to follow through these cases any thread which leads to an authentic definition and application of the constitutional restraints upon unlimited extensions of the police power. *Spann* v. *Dallas,* 111 Tex. 350; *Fitzhugh* v. *Jackson,* 132 Miss. 585; *State* v. *Thomas,* 96 W. Va. 628; *Tighe* v. *Osborne,* 131 Atl. 801; *Goldman* v. *Crowther,* 147 Md. 282; *Mayor* v. *Turk,* 129 Atl. 512; *State* v. *McKelvey,* 301 Mo. 130; *Ignaciunas* v. *Risley,* 98 N. J. L. 712; *Lachman* v. *Haughton,* 134 Minn. 226; *Roerig* v. *Minneapolis,* 136 Minn. 479; *Blackman* v. *Atlanta,* 151 Ga. 507; *State* v. *Edgcombe,* 108 Neb. 859; *Byrne* v. *Realty Co.,* 129 Md. 202; *Illinois* v. *Friend,* 261 Ill. 16; *Windsor* v. *Whitney,* 95 Conn. 357; *Losick* v. *Binda,* 128 Atl. 619; *Sarg* v. *Hooper,* 128 Atl. 376; *Ingersoll* v. *South Orange,* 128 Atl. 393; *Becker* v. *Dowling,* 128 Atl. 395; *Summit Co.* v. *Board,* 129 Atl. 819; *Reimer* v. *Dallas,* 129 Atl. 390; *Plymouth* v. *Bigelow,* 129 Atl. 203; *Printz* v. *Board of Adjustment,* 129 Atl. 123; *Passaic* v. *Patterson Bill Co.,* 72 N. J. L. 285; *Youngstown* v. *Kahn,* 113 Oh. St. 17; *Pritz* v. *Messer,* 113 Oh. St. 89.

New conditions may arise and new discoveries be made that will cause new conceptions of social needs and bring within the legislative power fields previously not occupied; but we frankly do not believe that there has been any such development of new conditions as necessitates or justifies the communal control of private property attempted by this ordinance, or by many others, some of which have been sustained by state courts. Restraints and restrictions upon alienation and use, even when imposed by covenant, are looked upon with disfavor and construed strictly in the interest of the free transfer and use of property. 7 R. C. L. 1115, citing *Hutchinson* v. *Ulrich,* 145 Ill. 335; *Hitz* v. *Flower,* 104 Oh. St. 47. Yet the theory of zoning, in its ampler definitions, assumes that the municipal councils will be able to do, comprehensively, what private owners, most interested, have found it difficult to do, even on a small scale.

That our cities should be made beautiful and orderly is, of course, in the highest degree desirable, but it is even more important that our people should remain free. Their freedom depends upon the preservation of their constitutional immunities and privileges against the desire of others to control them, no matter how generous the motive or well intended the control which it is sought to impose.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

The Village of Euclid is an Ohio municipal corporation. It adjoins and practically is a suburb of the City of Cleveland. Its estimated population is between 5,000 and 10,000, and its area from twelve to fourteen square miles, the greater part of which is farm lands or unimproved acreage. It lies, roughly, in the form of a parallelogram measuring approximately three and one-half miles each way. East and west it is traversed by three principal highways: Euclid Avenue, through the southerly border, St. Clair Avenue, through the central portion, and Lake Shore Boulevard, through the northerly border in close proximity to the shore of Lake Erie. The Nickel Plate railroad lies from 1,500 to 1,800 feet north of Euclid Avenue, and the Lake Shore railroad 1,600 feet farther to the north. The three highways and the two railroads are substantially parallel.

Appellee is the owner of a tract of land containing 68 acres, situated in the westerly end of the village, abutting on Euclid Avenue to the south and the Nickel Plate railroad to the north. Adjoining this tract, both on the east and on the west, there have been laid out restricted residential plats upon which residences have been erected.

On November 13, 1922, an ordinance was adopted by the Village Council, establishing a comprehensive zoning plan for regulating and restricting the location of trades,

industries, apartment houses, two-family houses, single family houses, etc., the lot area to be built upon, the size and height of buildings, etc.

The entire area of the village is divided by the ordinance into six classes of use districts, denominated U-1 to U-6, inclusive; three classes of height districts, denominated H-1 to H-3, inclusive; and four classes of area districts, denominated A-1 to A-4, inclusive. The use districts are classified in respect of the buildings which may be erected within their respective limits, as follows: U-1 is restricted to single family dwellings, public parks, water towers and reservoirs, suburban and interurban electric railway passenger stations and rights of way, and farming, non-commercial greenhouse nurseries and truck gardening; U-2 is extended to include two-family dwellings; U-3 is further extended to include apartment houses, hotels, churches, schools, public libraries, museums, private clubs, community center buildings, hospitals, sanitariums, public playgrounds and recreation buildings, and a city hall and courthouse; U-4 is further extended to include banks, offices, studios, telephone exchanges, fire and police stations, restaurants, theatres and moving picture shows, retail stores and shops, sales offices, sample rooms, wholesale stores for hardware, drugs and groceries, stations for gasoline and oil (not exceeding 1,000 gallons storage) and for ice delivery, skating rinks and dance halls, electric substations, job and newspaper printing, public garages for motor vehicles, stables and wagon sheds (not exceeding five horses, wagons or motor trucks) and distributing stations for central store and commercial enterprises; U-5 is further extended to include billboards and advertising signs (if permitted), warehouses, ice and ice cream manufacturing and cold storage plants, bottling works, milk bottling and central distribution stations, laundries, carpet cleaning, dry cleaning and dyeing establishments,

blacksmith, horseshoeing, wagon and motor vehicle repair shops, freight stations, street car barns, stables and wagon sheds (for more than five horses, wagons or motor trucks), and wholesale produce markets and salesrooms; U-6 is further extended to include plants for sewage disposal and for producing gas, garbage and refuse incineration, scrap iron, junk, scrap paper and rag storage, aviation fields, cemeteries, crematories, penal and correctional institutions, insane and feeble minded institutions, storage of oil and gasoline (not to exceed 25,000 gallons), and manufacturing and industrial operations of any kind other than, and any public utility not included in, a class U-1, U-2, U-3, U-4 or U-5 use. There is a seventh class of uses which is prohibited altogether.

Class U-1 is the only district in which buildings are restricted to those enumerated. In the other classes the uses are cumulative; that is to say, uses in class U-2 include those enumerated in the preceding class, U-1; class U-3 includes uses enumerated in the preceding classes, U-2 and U-1; and so on. In addition to the enumerated uses, the ordinance provides for accessory uses, that is, for uses customarily incident to the principal use, such as private garages. Many regulations are provided in respect of such accessory uses.

The height districts are classified as follows: In class H-1, buildings are limited to a height of two and one-half stories or thirty-five feet; in class H-2, to four stories or fifty feet; in class H-3, to eighty feet. To all of these, certain exceptions are made, as in the case of church spires, water tanks, etc.

The classification of area districts is: In A-1 districts, dwellings or apartment houses to accommodate more than one family must have at least 5,000 square feet for interior lots and at least 4,000 square feet for corner lots; in A-2 districts, the area must be at least 2,500 square feet for interior lots, and 2,000 square feet for corner lots; in A-3

districts, the limits are 1,250 and 1,000 square feet, respectively; in A-4 districts, the limits are 900 and 700 square feet, respectively. The ordinance contains, in great variety and detail, provisions in respect of width of lots, front, side and rear yards, and other matters, including restrictions and regulations as to the use of bill boards, sign boards and advertising signs.

A single family dwelling consists of a basement and not less than three rooms and a bathroom. A two-family dwelling consists of a basement and not less than four living rooms and a bathroom for each family; and is further described as a detached dwelling for the occupation of two families, one having its principal living rooms on the first floor and the other on the second floor.

Appellee's tract of land comes under U-2, U-3 and U-6. The first strip of 620 feet immediately north of Euclid Avenue falls in class U-2, the next 130 feet to the north, in U-3, and the remainder in U-6. The uses of the first 620 feet, therefore, do not include apartment houses, hotels, churches, schools, or other public and semi-public buildings, or other uses enumerated in respect of U-3 to U-6, inclusive. The uses of the next 130 feet include all of these, but exclude industries, theatres, banks, shops, and the various other uses set forth in respect of U-4 to U-6, inclusive.*

---

* The court below seemed to think that the frontage of this property on Euclid Avenue to a depth of 150 feet came under U-1 district and was available only for single family dwellings. An examination of the ordinance and subsequent amendments, and a comparison of their terms with the maps, shows very clearly, however, that this view was incorrect. Appellee's brief correctly interpreted the ordinance: "The northerly 500 feet thereof immediately adjacent to the right of way of the New York, Chicago & St. Louis Railroad Company under the original ordinance was classed as U-6 territory and the rest thereof as U-2 territory. By amendments to the ordinance a strip 630 [620] feet wide north of Euclid Avenue is classed as U-2 territory, a strip 130 feet wide next north as U-3 territory and the rest of the parcel to the Nickel Plate right of way as U-6 territory."

Annexed to the ordinance, and made a part of it, is a zone map, showing the location and limits of the various use, height and area districts, from which it appears that the three classes overlap one another; that is to say, for example, both U-5 and U-6 use districts are in A-4 area districts, but the former is in H-2 and the latter in H-3 height districts. The plan is a complicated one and can be better understood by an inspection of the map, though it does not seem necessary to reproduce it for present purposes.

The lands lying between the two railroads for the entire length of the village area and extending some distance on either side to the north and south, having an average width of about 1,600 feet, are left open, with slight exceptions, for industrial and all other uses. This includes the larger part of appellee's tract. Approximately one-sixth of the area of the entire village is included in U-5 and U-6 use districts. That part of the village lying south of Euclid Avenue is principally in U-1 districts. The lands lying north of Euclid Avenue and bordering on the long strip just described are included in U-1, U-2, U-3 and U-4 districts, principally in U-2.

The enforcement of the ordinance is entrusted to the inspector of buildings, under rules and regulations of the board of zoning appeals. Meetings of the board are public, and minutes of its proceedings are kept. It is authorized to adopt rules and regulations to carry into effect provisions of the ordinance. Decisions of the inspector of buildings may be appealed to the board by any person claiming to be adversely affected by any such decision. The board is given power in specific cases of practical difficulty or unnecessary hardship to interpret the ordinance in harmony with its general purpose and intent, so that the public health, safety and general welfare may be secure and substantial justice done. Penalties are prescribed for violations, and it is provided that the various

provisions are to be regarded as independent and the holding of any provision to be unconstitutional, void or ineffective shall not affect any of the others.

The ordinance is assailed on the grounds that it is in derogation of § 1 of the Fourteenth Amendment to the Federal Constitution in that it deprives appellee of liberty and property without due process of law and denies it the equal protection of the law, and that it offends against certain provisions of the Constitution of the State of Ohio. The prayer of the bill is for an injunction restraining the enforcement of the ordinance and all attempts to impose or maintain as to appellee's property any of the restrictions, limitations or conditions. The court below held the ordinance to be unconstitutional and void, and enjoined its enforcement. 297 Fed. 307.

Before proceeding to a consideration of the case, it is necessary to determine the scope of the inquiry. The bill alleges that the tract of land in question is vacant and has been held for years for the purpose of selling and developing it for industrial uses, for which it is especially adapted, being immediately in the path of progressive industrial development; that for such uses it has a market value of about $10,000 per acre, but if the use be limited to residential purposes the market value is not in excess of $2,500 per acre; that the first 200 feet of the parcel back from Euclid Avenue, if unrestricted in respect of use, has a value of $150 per front foot, but if limited to residential uses, and ordinary mercantile business be excluded therefrom, its value is not in excess of $50 per front foot.

It is specifically averred that the ordinance attempts to restrict and control the lawful uses of appellee's land so as to confiscate and destroy a great part of its value; that is being enforced in accordance with its terms; that prospective buyers of land for industrial, commercial and residential uses in the metropolitan district of Cleveland

are deterred from buying any part of this land because of the existence of the ordinance and the necessity thereby entailed of conducting burdensome and expensive litigation in order to vindicate the right to use the land for lawful and legitimate purposes; that the ordinance constitutes a cloud upon the land, reduces and destroys its value, and has the effect of diverting the normal industrial, commercial and residential development thereof to other and less favorable locations.

The record goes no farther than to show, as the lower court found, that the normal, and reasonably to be expected, use and development of that part of appellee's land adjoining Euclid Avenue is for general trade and commercial purposes, particularly retail stores and like establishments, and that the normal, and reasonably to be expected, use and development of the residue of the land is for industrial and trade purposes. Whatever injury is inflicted by the mere existence and threatened enforcement of the ordinance is due to restrictions in respect of these and similar uses; to which perhaps should be added—if not included in the foregoing—restrictions in respect of apartment houses. Specifically, there is nothing in the record to suggest that any damage results from the presence in the ordinance of those restrictions relating to churches, schools, libraries and other public and semi-public buildings. It is neither alleged nor proved that there is, or may be, a demand for any part of appellee's land for any of the last named uses; and we cannot assume the existence of facts which would justify an injunction upon this record in respect of this class of restrictions. For present purposes the provisions of the ordinance in respect of these uses may, therefore, be put aside as unnecessary to be considered. It is also unnecessary to consider the effect of the restrictions in respect of U–1 districts, since none of appellee's land falls within that class.

23468°—27——25

We proceed, then, to a consideration of those provisions of the ordinance to which the case as it is made relates, first disposing of a preliminary matter.

A motion was made in the court below to dismiss the bill on the ground that, because complainant [appellee] had made no effort to obtain a building permit or apply to the zoning board of appeals for relief as it might have done under the terms of the ordinance, the suit was premature. The motion was properly overruled. The effect of the allegations of the bill is that the ordinance of its own force' operates greatly to reduce the value of appellee's lands and destroy their marketability for industrial, commercial and residential uses; and the attack is directed, not against any specific provision or provisions, but against the ordinance as an entirety. Assuming the premises, the existence and maintenance of the ordinance, in effect, constitutes a present invasion of appellee's property rights and a threat to continue it. Under these circumstances, the equitable jurisdiction is clear. See *Terrace* v. *Thompson,* 263 U. S. 197, 215; *Pierce* v. *Society of Sisters,* 268 U. S. 510, 535.

It is not necessary to set forth the provisions of the Ohio Constitution which are thought to be infringed. The question is the same under both Constitutions, namely, as stated by appellee: Is the ordinance invalid in that it violates the constitutional protection " to the right of property in the appellee by attempted regulations under the guise of the police power, which are unreasonable and confiscatory? "

Building zone laws are of modern origin. They began in this country about twenty-five years ago. Until recent years, urban life was comparatively simple; but with the great increase and concentration of population, problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands in

urban communities. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. Such regulations are sustained, under the complex conditions of our day, for reasons analogous to those which justify traffic regulations, which, before the advent of automobiles and rapid transit street railways, would have been condemned as fatally arbitrary and unreasonable. And in this there is no inconsistency, for while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world, it is impossible that it should be otherwise. But although a degree of elasticity is thus imparted, not to the *meaning,* but to the *application* of constitutional principles, statutes and ordinances, which, after giving due weight to the new conditions, are found clearly not to conform to the Constitution, of course, must fall.

The ordinance now under review, and all similar laws and regulations, must find their justification in some aspect of the police power, asserted for the public welfare. The line which in this field separates the legitimate from the illegitimate assumption of power is not capable of precise delimitation. It varies with circumstances and conditions. A regulatory zoning ordinance, which would be clearly valid as applied to the great cities, might be clearly invalid as applied to rural communities. In solving doubts, the maxim *sic utere tuo ut alienum non laedas,* which lies at the foundation of so much of the common law of nuisances, ordinarily will furnish a fairly helpful clew. And the law of nuisances, likewise, may be consulted, not for the purpose of controlling, but for the helpful aid of its analogies in the process of ascertaining

the scope of, the power. Thus the question whether the power exists to forbid the erection of a building of a particular kind or for a particular use, like the question whether a particular thing is a nuisance, is to be determined, not by an abstract consideration of the building or of the thing considered apart, but by considering it in connection with the circumstances and the locality. *Sturgis* v. *Bridgeman,* L. R. 11 Ch. 852, 865. A nuisance may be merely a right thing in the wrong place,—like a pig in the parlor instead of the barnyard. If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control. *Radice* v. *New York,* 264 U. S. 292, 294.

There is no serious difference of opinion in respect of the validity of laws and regulations fixing the height of buildings within reasonable limits, the character of materials and methods of construction, and the adjoining area which must be left open, in order to minimize the danger of fire or collapse, the evils of over-crowding, and the like, and excluding from residential sections offensive trades, industries and structures likely to create nuisances. See *Welch* v. *Swasey,* 214 U. S. 91; *Hadacheck* v. *Los Angeles,* 239 U. S. 394; *Reinman* v. *Little Rock,* 237 U. S. 171; *Cusack Co.* v. *City of Chicago,* 242 U. S. 526, 529–530.

Here, however, the exclusion is in general terms of all industrial establishments, and it may thereby happen that not only offensive or dangerous industries will be excluded, but those which are neither offensive nor dangerous will share the same fate. But this is no more than happens in respect of many practice-forbidding laws which this Court has upheld although drawn in general terms so as to include individual cases that may turn out to be innocuous in themselves. *Hebe Co.* v. *Shaw,* 248 U. S. 297, 303; *Pierce Oil Corp.* v. *City of Hope,* 248 U. S. 498, 500. The inclusion of a reasonable margin to insure effective enforcement, will not put upon a law, otherwise

valid, the stamp of invalidity. Such laws may also find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation. In the light of these considerations, we are not prepared to say that the end in view was not sufficient to justify the general rule of the ordinance, although some industries of an innocent character might fall within the proscribed class. It can not be said that the ordinance in this respect " passes the bounds of reason and assumes the character of a merely arbitrary fiat." *Purity Extract Co.* v. *Lynch,* 226 U. S. 192, 204. Moreover, the restrictive provisions of the ordinance in this particular may be sustained upon the principles applicable to the broader exclusion from residential districts of all business and trade structures, presently to be discussed.

It is said that the Village of Euclid is a mere suburb of the City of Cleveland; that the industrial development of that city has now reached and in some degree extended into the village and, in the obvious course of things, will soon absorb the entire area for industrial enterprises; that the effect of the ordinance is to divert this natural development elsewhere with the consequent loss of increased values to the owners of the lands within the village borders. But the village, though physically a suburb of Cleveland, is politically a separate municipality, with powers of its own and authority to govern itself as it sees fit within the limits of the organic law of its creation and the State and Federal Constitutions. Its governing authorities, presumably representing a majority of its inhabitants and voicing their will, have determined, not that industrial development shall cease at its boundaries, but that the course of such development shall proceed within definitely fixed lines. If it be a proper exercise of the police power to relegate industrial establishments to local-

ities separated from residential sections, it is not easy to find a sufficient reason for denying the power because the effect of its exercise is to divert an industrial flow from the course which it would follow, to the injury of the residential public if left alone, to another course where such injury will be obviated. It is not meant by this, however, to exclude the possibility of cases where the general public interest would so far outweigh the interest of the municipality that the municipality would not be allowed to stand in the way.

We find no difficulty in sustaining restrictions of the kind thus far reviewed. The serious question in the case arises over the provisions of the ordinance excluding from residential districts, apartment houses, business houses, retail stores and shops, and other like establishments. This question involves the validity of what is really the crux of the more recent zoning legislation, namely, the creation and maintenance of residential districts, from which business and trade of every sort, including hotels and apartment houses, are excluded. Upon that question, this Court has not thus far spoken. The decisions of the state courts are numerous and conflicting; , but those which broadly sustain the power greatly outnumber those which deny altogether or narrowly limit it; and it is very apparent that there is a constantly increasing tendency in the direction of the broader view. We shall not attempt to review these decisions at length, but content ourselves with citing a few as illustrative of all.

As sustaining the broader view, see *Opinion of the Justices,* 234 Mass. 597, 607; *Inspector of Buildings of Lowell* v. *Stoklosa,* 250 Mass. 52; *Spector* v. *Building Inspector of Milton,* 250 Mass. 63; *Brett* v. *Building Commissioner of Brookline,* 250 Mass. 73; *State* v. *City of New Orleans,* 154 La. 271, 282; *Lincoln Trust Co.* v. *Williams Bldg. Corp.,* 229 N. Y. 313; *City of Aurora* v. *Burns,* 319 Ill. 84, 93; *Deynzer* v. *City of Evanston,* 319 Ill. 226;

*State ex rel. Beery* v. *Houghton,* 164 Minn. 146; *State ex rel. Carter* v. *Harper,* 182 Wis. 148, 157–161; *Ware* v. *City of Wichita,* 113 Kan. 153; *Miller* v. *Board of Public Works,* 195 Cal. 477, 486–495; *City of Providence* v. *Stephens,* 133 Atl. 614.

For the contrary view, see *Goldman* v. *Crowther,* 147 Md. 282; *Ignaciunas* v. *Risley,* 98 N. J. L. 712; *Spann* v. *City of Dallas,* 111 Tex. 350.

As evidence of the decided trend toward the broader view, it is significant that in some instances the state courts in later decisions have reversed their former decisions holding the other way. For example, compare *State ex rel. Beery* v. *Houghton, supra,* sustaining the power, with *State ex rel. Lachtman* v. *Houghton,* 134 Minn. 226; *State ex rel. Roerig* v. *City of Minneapolis,* 136 Minn. 479; and *Vorlander* v. *Hokenson,* 145 Minn. 484, denying it, all of which are disapproved in the *Houghton* case (p. 151) last decided.

The decisions enumerated in the first group cited above agree that the exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are—promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community by excluding from residential areas the confusion and danger of fire, contagion and disorder which in greater or less degree attach to the location of stores, shops and factories. Another ground is that the construction and repair of streets may be rendered easier and less expensive by confining the greater part of the heavy traffic to the streets where business is carried on.

The Supreme Court of Illinois, in *City of Aurora* v. *Burns, supra,* pp. 93–95, in sustaining a comprehensive building zone ordinance dividing the city into eight districts, including exclusive residential districts for one and two-family dwellings, churches, educational institutions and schools, said:

" The constantly increasing density of our urban populations, the multiplying forms of industry and the growing complexity of our civilization make it necessary for the State, either directly or through some public agency by its sanction, to limit individual activities to a greater extent than formerly. With the growth and development of the State the police power necessarily develops, within reasonable bounds, to meet the changing conditions. . . .

" . . . The harmless may sometimes be brought within the regulation or prohibition in order to abate or destroy the harmful. The segregation of industries commercial pursuits and dwellings to particular districts in a city, when exercised reasonably, may bear a rational relation to the health, morals, safety and general welfare of the community. The establishment of such districts or zones may, among other things, prevent congestion of population, secure quiet residence districts, expedite local transportation, and facilitate the suppression of disorder, the extinguishment of fires and the enforcement of traffic and sanitary regulations. The danger of fire and the risk of contagion are often lessened by the exclusion of stores and factories from areas devoted to residences, and, in consequence, the safety and health of the community may be promoted. . . . .

". . . The exclusion of places of business from residential districts is not a declaration that such places are nuisances or that they are to be suppressed as such, but it is a part of the general plan by which the city's territory is allotted to different uses in order to prevent, or at least to reduce, the congestion, disorder and dangers

which often inhere in unregulated municipal development."

The Supreme Court of Louisiana, in *State* v. *City of New Orleans, supra,* pp. 282–283, said:

" In the first place, the exclusion of business establishments from residence districts might enable the municipal government to give better police protection. Patrolmen's beats are larger, and therefore fewer, in residence neighborhoods than in business neighborhoods. A place of business in a residence neighborhood furnishes an excuse for any criminal to go into the neighborhood, where, otherwise, a stranger would be under the ban of suspicion. Besides, open shops invite loiterers and idlers to congregate; and the places of such congregations need police protection. In the second place, the zoning of a city into residence districts and commercial districts is a matter of economy in street paving. Heavy trucks, hauling freight to and from places of business in residence districts, require the city to maintain the same costly pavement in such districts that is required for business districts; whereas, in the residence districts, where business establishments are excluded, a cheaper pavement serves the purpose. . . .

"Aside from considerations of economic administration, in the matter of police and fire protection, street paving, etc., any business establishment is likely to be a genuine nuisance in a neighborhood of residences. Places of business are noisy; they are apt to be disturbing at night; some of them are malodorous; some are unsightly; some are apt to breed rats, mice, roaches, flies, ants, etc. . . .

" If the municipal council deemed any of the reasons which have been suggested, or any other substantial reason, a sufficient reason for adopting the ordinance in question, it is not the province of the courts to take issue with the council. We have nothing to do with the question of the wisdom or good policy of municipal ordinances. If they are not satisfying to a majority of the citizens, their recourse is to the ballot—not the courts."

The matter of zoning has received much attention at the hands of commissions and experts, and the results of their investigations have been set forth in comprehensive reports. These reports, which bear every evidence of painstaking consideration, concur in the view that the segregation of residential, business, and industrial buildings will make it easier to provide fire apparatus suitable for the character and intensity of the development in each section; that it will increase the safety and security of home life; greatly tend to prevent street accidents, especially to children, by reducing the traffic and resulting confusion in residential sections; decrease noise and other conditions which produce or intensify nervous disorders; preserve a more favorable environment in which to rear children, etc. With particular reference to apartment houses, it is pointed out that the development of detached house sections is greatly retarded by the coming of apartment houses, which has sometimes resulted in destroying the entire section for private house purposes; that in such sections very often the apartment house is a mere parasite, constructed in order to take advantage of the open spaces and attractive surroundings created by the residential character of the district. Moreover, the coming of one apartment house is followed by others, interfering by their height and bulk with the free circulation of air and monopolizing the rays of the sun which otherwise would fall upon the smaller homes, and bringing, as their necessary accompaniments, the disturbing noises incident to increased traffic and business, and the occupation, by means of moving and parked automobiles, of larger portions of the streets, thus detracting from their safety and depriving children of the privilege of quiet and open spaces for play, enjoyed by those in more favored localities,—until, finally, the residential character of the neighborhood and its desirability as a place of detached residences are utterly destroyed. Under these circum-

stances, apartment houses, which in a different environment would be not only entirely unobjectionable but highly desirable, come very near to being nuisances.

If these reasons, thus summarized, do not demonstrate the wisdom or sound policy in all respects of those restrictions which we have indicated as pertinent to the inquiry, at least, the reasons are sufficiently cogent to preclude us from saying, as it must be said before the ordinance can be declared unconstitutional, that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. *Cusack Co.* v. *City of Chicago, supra,* pp. 530-531; *Jacobson* v. *Massachusetts,* 197 U. S. 11, 30–31.

It is true that when, if ever, the provisions set forth in the ordinance in tedious and minute detail, come to be concretely applied to particular premises, including those of the appellee, or to particular conditions, or to be considered in connection with specific complaints, some of them, or even many of them, may be found to be clearly arbitrary and unreasonable. But where the equitable remedy of injunction is sought, as it is here, not upon the ground of a present infringement or denial of a specific right, or of a particular injury in process of actual execution, but upon the broad ground that the mere existence and threatened enforcement of the ordinance, by materially and adversely affecting values and curtailing the opportunities of the market, constitute a present and irreparable injury, the court will not scrutinize its provisions, sentence by sentence, to ascertain by a process of piecemeal dissection whether there may be, here and there, provisions of a minor character, or relating to matters of administration, or not shown to contribute to the injury complained of, which, if attacked separately, might not withstand the test of constitutionality. In respect of such provisions, of which specific complaint is not

made, it cannot be said that the land owner has suffered or is threatened with an injury which entitles him to challenge their constitutionality. *Turpin* v. *Lemon*, 187 U. S. 51, 60. In *Railroad Commission Cases*, 116 U. S. 307, 335–337, this Court dealt with an analogous situation. There an act of the Mississippi legislature, regulating freight and passenger rates on intrastate railroads and creating a supervisory commission, was attacked as unconstitutional. The suit was brought to enjoin the commission from enforcing against the plaintiff railroad company any of its provisions. In an opinion delivered by Chief Justice Waite, this Court held that the chief purpose of the statute was to fix a maximum of charges and to regulate in some matters of a police nature the use of railroads in the state. After sustaining the constitutionality of the statute " in its general scope " this Court said: " Whether in some of its details the statute may be defective or invalid we do not deem it necessary to inquire, for this suit is brought to prevent the commissioners from giving it any effect whatever as against this company." Quoting with approval from the opinion of the Supreme Court of Mississippi it was further said: " Many questions may arise under it not necessary to be disposed of now, and we leave them for consideration when presented." And finally: " When the commission has acted and proceedings are had to enforce what it has done, questions may arise as to the validity of some of the various provisions which will be worthy of consideration, but we are unable to say that, as a whole, the statute is invalid."

The relief sought here is of the same character, namely, an injunction against the enforcement of any of the restrictions, limitations or conditions of the ordinance. And the gravamen of the complaint is that a portion of the land of the appellee cannot be sold for certain enumer-

ated uses because of the general and broad restrain: of the ordinance. What would be the effect of a restraint imposed by one or more of the innumerable provisions of the ordinance, considered apart, upon the value or marketability of the lands is neither disclosed by the bill nor by the evidence, and we are afforded no basis, apart from mere speculation, upon which to rest a conclusion that it or they would have any appreciable effect upon those matters. Under these circumstances, therefore, it is enough for us to determine, as we do, that the ordinance in its general scope and dominant features, so far as its provisions are here involved, is a valid exercise of authority, leaving other provisions to be dealt with as cases arise directly involving them.

And this is in accordance with the traditional policy of this Court. In the realm of constitutional law, especially, this Court has perceived the embarrassment which is likely to result from an attempt to formulate rules or decide questions beyond the necessities of the immediate issue. It has preferred to follow the method of a gradual approach to the general by a systematically guarded application and extension of constitutional principles to particular cases as they arise, rather than by out of hand attempts to establish general rules to which future cases must be fitted. This process applies with peculiar force to the solution of questions arising under the due process clause of the Constitution as applied to the exercise of the flexible powers of police, with which we are here concerned.

*Decree reversed.*

MR. JUSTICE VAN DEVANTER, MR. JUSTICE MCREYNOLDS and MR. JUSTICE BUTLER, dissent.