STAKER ET AL. *v.* BROWN ET AL.

[Cite as Staker v. Brown (1974), 41 Ohio Misc. 144.]

(No. Civ. 74-302—Decided October 23, 1974.)

Court of Common Pleas of Scioto County, General Division.

*Mr. John W. Thatcher,* for plaintiffs.
*Mr. Jack D. Young,* for defendants.

MARSHALL, J.  Plaintiffs, residents and owners of property situated on Gilbert Avenue in the city of Portsmouth, Ohio, which is designated a "Residence A District" by the Planning and Zoning Code of the city, seek to enjoin the defendants from maintaining and operating a child day-care center on their premises located at No. 2930 Gilbert Ave., which is Lot No. 4 of the Hearthstone Addition in and to said city.  R. C. 5104.01(B) provides: " '[C]hild day-care center' means any place in which child day-care is provided for five or more infants, pre-school children, or school-age children outside of school hours in average daily attendance, other than the children of the owner or administrator of the center, with or without compensation."  Subsection (A) excludes from the definition of "child day-care" programs under the supervision of the Department of Education.  The defendants have converted the garage which is attached to the south end of their residence for this purpose and have enclosed the rear yard by means of a chain link fence four feet in height.  Mr. Brown testified that the center would be in operation from 8:30 o'clock A. M. to 5:30 o'clock P. M.; would be staffed by his wife,

one full time employee and one part-time employee; and would be for the care of pre-school age children. Mrs. Brown testified that she has applied for a license to the Director of Public Welfare, pursuant to R. C. 5104.03, and, although none has yet been issued, a representative of the director has examined the premises and indicated that the premises would be suitable for the operation of a child day-care center with an average daily attendance not to exceed 20 children. She stated that the application was made by her as owner and that Mrs. Katherine Tipton was to be the administrator. Mrs. Tipton resides at 1442 Coles Blvd., in Portsmouth, and has had three years experience as a teacher's aid, although she is not a certificated teacher. Mrs. Brown is a high-school graduate and the mother of two children. She further stated that she has arranged for the employment of another woman on a half-day basis; and that the center is to be named "Kiddie Kollege."

The lot which is the subject of the action extends 38 feet on Coles Boulevard and 115 feet on Gilbert Avenue. Portsmouth City Solicitor, Edward V. Leach, Jr., testified that at a meeting of the Zoning Board of Appeals conducted January 6, 1970, the then owner, William J. Essman, requested a variance from the zoning regulations for the purpose of constructing a dwelling house 32 feet in length and 21 feet in depth fronting on Gilbert Avenue. The variance was requested because the code requires a 20-foot set back from the street for a front yard and a minimum distance of 40 feet from the principal building to the rear lot line for the rear yard. The minutes of the Zoning Board of Appeals reflect that the variance was granted only after assurance by Mr. Essman that the building would not be used for a commercial purpose, and only as a private residence.

William J. Essman, father of Mrs. Brown, testified that he applied for the variance on behalf of his daughter and son-in-law; and that subsequent to the filing of this action he deeded to the defendants Lot No. 5 of the Hearthstone Addition, which is contiguous to Lot No. 4 on the east, and is of the same dimensions as Lot No. 4. (See deed dated September 11, 1974, recorded in Vol. 180, at

page 111, of the Record of Deeds of Scioto County, Ohio.) The additional conveyance to the defendants has no bearing upon the use restrictions imposed by the zoning code. It is to be noted that even with the two lots, the dwelling house of the defendants would be in violation of the building provisions of the Code, if the variance had not been granted.

One of the permitted uses in a "Residence A District" is "(5) educational use, public library or museum." One of the contentions of the defendants is that a child day-care center falls within the category of a school or educational use. The Court of Appeals of Louisana in the case of *Lake Side Day Care Center* v. *Board of Adjustment, City of Baton Rouge* (1960), 121 So. 2d 335, had before it this specific issue. In that case, among the permitted uses under the zoning ordinance were public elementary and high schools, private schools, nursery, prekindergarten, or kindergarten schools. The court holding that a day-care center does not fall within the purview of any of these classifications, stated that the primary purpose of a day-care center is not education but instead the all day care of children of working mothers; and stated, at page 338, that "the Legislature has * * * recognized the difference between a kindergarten and a day care center" in that none of the persons connected with the center were qualified as teachers and that the program had very little reference to teaching or instructions of any sort; and that "the Legislature has authorized the Department of Public Welfare, not the Department of Education, to license and supervise day care centers."

In this context it is to be noted that the authority to issue licenses for the operation of day-care centers in Ohio has also been vested by the Legislature within the jurisdiction of the Department of Welfare, rather than the Department of Education; and that there is no requirement that the administrator or staff members hold teaching certificates.

It must, therefore, be concluded that a child day-care center is not embraced within the meaning of the term "educational use." The case of *Lakewood* v. *Farren* (1938),

27 Ohio Law Abs. 351, is to be distinguished. The court found in that case that the defendant kept eight to twelve children aged three and four in her home for about two hours in the morning several days a week, and that they never played in the yard. It concluded that these facts were "not sufficient to change the character of the building as a home, thereby placing it in the classification of buildings used for commercial purposes." It held that, at most, this was a mere "technical violation" of the zoning ordinance, and "we do feel that this case is not one where the court should be called upon by injunction to enforce the letter of the said zoning ordinance." In *Staten* v. *City of Portsmouth* (case No. 44112, unreported, decided by a prior occupant of this bench in 1958), the ordinance was declared unconstitutional. The present ordinance was enacted in 1965, subsequent to that holding. To the extent that the holding in the *Staten* case conflicts with the decision of the court herein, it is expressly repudiated.

The defendants also contend that their operation would fall within the category of home or office occupation. These terms are defined as follows in the Planning and Zoning Code, Section 1133.02 (a), "Permitted Uses:" "(9) Home occupation or office occupation such as that of physician, surgeon or dentist residing on the premises."

Under Section 1131.01, "Definitions":

"(21) Home occupation means such occupations as dressmaking, preserving, home cooking and a professional occupation of a resident of the premises subject to the limitations of this subsection. Any occupation, activity and/or use is hereby prohibited, nor shall any occupation, activity or use be construed to be permitted or included within the terms 'home occupation,' 'home industry' and 'accessory use,' when such occupation, activity and/or use is as follows: is injurious, noxious, offensive or detrimental to the neighborhood; is carried on by persons that are not residents of the dwelling on the premises; requires employment of persons a majority of whom are outside of the residing family; generates pedestrian or automobile traffic of clients or associates; involves the use of, or occupies, any other space or any other building besides the

main building; requires the use of, or occupies more than one-half of the floor area of one story; involves the use of material or equipment not normally associated with the residential household; involves sale of commodities on the premises or sale of product not raised on the premises; involves any display that will indicate from the exterior that the building is being utilized for any purpose other than that of a dwelling; involves the use of any commercial sign, any artificially lighted sign or any sign exceeding eight square feet in area and any sign located within the front yard; involves any automobile dismantling or any automobile repair work with vehicular storage on the premises and the streets and alleys in excess of the restrictions of the Residence Districts; involves any treatment, care, boarding or lodging of epileptics, persons addicted to or recuperating from alcoholism, drug addicts, the insane or the feeble-minded; is used as a funeral home, mortuary or undertaking establishment, laundry, dry cleaning or clothes pressing establishment, convalescing or nursing home, tourist home, massage parlor, barber shop, beauty parlor or similar establishment; violates any restrictions applying to accessory uses in Residence Districts or involves any other occupation, use or activity that is excluded or prohibited or otherwise not permitted in this subsection."

"(29) Office occupation means a professional occupation of a resident on the premises such as that of a physician, surgeon or dentist, subject to the same restrictions herein established for the term 'home occupation' where such office occupation is conducted within a Residence District."

"(2) Accessory building means a building which is subordinate to the main or principal building.

"(3) Accessory use means a subordinate use of a portion of the lot or premises which is incidental to the main use of the premises. The term accessory use shall not be construed either to include or to permit any occupation, activity or use prohibited under the definitions and restrictions herein established for home occupation."

From the testimony of the plaintiffs, it is clear that the proposed operation is "offensive" to them. According to Mr. Brown's testimony, a majority of the employees will be "outside of the residing family." Since Mrs. Tipton is to be the administrator, the business would be carried on by a person who is not a resident of the dwelling on the premises. The transportation of children to and from the center will undeniably generate "pedestrian or automobile traffic." Since the converted garage and yard area would constitute the portion of the premises to be utilized by the center, this would involve the use of "any other space or any other building besides the main building." If a sign were to be erected, that would "indicate from the exterior that the building is being utilized for any purpose other than that of a dwelling." It would violate the "restrictions applying to accessory uses in Residence Districts." Finally it would involve an "occupation, use or activity that is excluded or prohibited or otherwise not permitted in this subsection."

Obviously the operation of a child day-care center can not be construed as a home or office occupation, as defined by the code.

The constitutionality of comprehensive zoning regulations such as those adopted by the Portsmouth City Council is so well established that the general challenge thereof by the defendants does not warrant comment. *Euclid* v. *Ambler Realty Co.* (1926), 272 U. S. 365. The power of cities to establish districts limited to residential uses is inherent in the power to zone; and it is specifically authorized by statute. (R. C. 713.07.)

The contention that the plaintiffs have no standing to maintain this action without first exhausting administrative remedies is also without merit. R. C. 713.13 provides: "No person shall erect, construct, alter, repair, or maintain any building or structure or use any land in violation of any zoning ordinance or regulation enacted pursuant to Sections 713.06 to 713.13, inclusive, of the Revised Code, or Section 3 of Article XVIII, Ohio Constitution. In the event of any such violation, or imminent threat thereof, the mu-

nicipal corporation, or the owner of any contiguous or neighboring property who would be especially damaged by such violation, in addition to any other remedies provided by law, may institute a suit for injunction to prevent or terminate such violation." Due to their proximity, the plaintiffs, and other residents of the neighborhood, are the only persons who could claim to be damaged by the operation of the center, and they are entitled to the protection of the statute.

The validity of a particular use classification established by a municipality in the exercise of its zoning authority is ordinarily not the subject of judicial review. "Zoning is primarily a legislative function, involving political questions, and not a judicial function." *Shopping Centers of Greater Cincinnati* v. *Cincinnati* (1958), 83 Ohio Law Abs. 548, 173 N. E. 2d 196. Our doctrine of the separation of powers among the legislative, executive and judicial branches of government provides both safeguards and prohibitions, which experience has proved to be highly beneficial to our citizens. "The wisdom of a zoning ordinance and its relation to public health, safety, morals, and general welfare is, in the first intance, left to the judgment and discretion of the legislative body which creates it and judicial judgment is not to be substituted for legislative judgment in any case where the validity of the zoning ordinance is fairly debatable." *Edge* v. *Moraine* (1970), 283 N. E. 2d 219, 223.

Defendants introduced into evidence a building permit issued by the city Department of Buildings. Mr. Brown testified that he has made the alterations and expended money in reliance thereon. It is regrettable if the defendants have expended funds unnecessarily; however, it is a basic precept that a misunderstanding or ignorance of the law is no excuse, and cannot be relied upon to further private interests. In addition, the father of Mrs. Brown who applied for, and was granted, the variance in his own name, although he was actually acting on behalf of the defendants, knew, or should have known, that it was granted on the specific condition that the premises were to be used only as a residence.

The court has no knowledge of what conversation transpired between the defendants and the city building officer. It is immaterial, however, because that officer is required to issue permits only in accordance with the Zoning Code. Section 1131.02 provides: "It shall be the duty of the person designated or appointed by the City Manager as the Building Officer to enforce this Zoning Code by the grant or refusal of building permits and occupancy authorizations and in accordance with the provisions of the Zoning Code." There is no indication that such officer violated his authority, since the building permit states that it was issued to "Remodel Room To Be Built in Accordance With Building Code and Zoning Ordinance."

A permanent injunction is ordered as prayed for.