Municipal Court of Cincinnati.

CITY OF CINCINNATI V. GEORGE STRUBLE ET AL.

Decided November 13, 1931.

*Edward Alexander* and *Harry J. Wernke,* city prosecutors, for city.

*Zielonka & Kuertz,* for defendants.

HESS, J.

On April 1, 1924, the council of the city of Cincinnati enacted Ordinance 71-1924 dividing the city of Cincinnati into various residence, business and industrial zones and established certain restrictions as to building development and building uses in the respective zones.

George Struble was arrested pursuant to an affidavit

filed with the clerk of the Municipal Court which charges that he is the owner of the property known as No. 7469 Lower River Road, Cincinnati, Ohio: That:

"On or about the 17th day of August, 1931, in the city of Concinnati, County of Hamilton, he did then and there unlawfully and willfully permit the use of said premises as a place of business, to-wit: a restaurant; the said building having been converted from a residence into a place of business contrary to and in violation of Section 452-91 of the Building Zone Code of the city of Cincinnati."

At or about the time the Struble affidavit was filed, an affidavit was filed charging Grace Phelps with the operation of a restaurant at No. 7469 Lower River Road and states that she did—

"then and there unlawfully and willfully use said premises as a place of business, the said building having been converted from a residence to a place of business contrary to and in violation of Section 452-91 of the Building Zone Code of the city of Cincinnati."

Section 452-91 further reads as follows:

"It shall be unlawful for any person to use or permit the use of any building or premises or part thereof hereafter created, erected, changed, converted, or enlarged wholly or in part in its structure contrary to the provisions of this ordinance."

Section 452-92 provides for a fine of not to exceed Five Hundred Dollars for the violation of the ordinance above quoted.

To the charges thus placed against the defendants, George Struble and Grace Phelps, each entered a plea of "Not Guilty." Both were represented by the same counsel and by agreement of counsel for both the city of Cincinnati and the defendants their cases were tried together, as the testimony in both cases would be the same.

The defendants did not deny that they are operating a restaurant business in the zone restricted to "Residence B." The plea of not guilty in substance sets forth that

the city of Cincinnati and its council and other officers and boards have placed the premises occupied by the defendant in "Residence B" district of the city of Cincinnati and have refused to place said premises in a business or industrial district of said city, although application has been made to change the said zone; that under the zoning code of the city of Cincinnati property zoned in the industrial or business district may be used and operated for conducting a restaurant and certain other business; that the zoning of the premises occupied by the defendants in the "Residence B" district of said city and excluding said premises from said industrial district or business district does not bear a real or substantial relation to the health, safety, morals, convenience, or general welfare of the inhabitants of that part of said city of Cincinnati in which the premises are located. And further that the action of said city of Cincinnati in zoning said premises in the "Residence B" district and in excluding said premises from said industrial or business district and in refusing to permit defendants to use said premises for the uses in accordance with the provisions of the industrial or business district is arbitrary, unreasonable and unjustifiable and constitutes an abuse of the power vested in them and a deprivation of the defendants' property rights without compensation and without due process of law, contrary to Article 1, Sections 1 and 19 of the Constitution of the state of Ohio and contrary to the Fourteenth Amendment of the Constitution of the United States of America.

The "Not Guilty" plea of the defendants to the charges made against them raises the question of the constitutionality of the zoning ordinance as it applies to the property in question herein, owned by George Struble, upon which Grace Phelps operates a restaurant.

In order to determine this question it is necessary that an examination of the property surrounding that of the defendants be made.

The former villages of Delhi, Sayler Park, and Fernbank, constitute a somewhat isolated part of the city of Cincinnati. Generally speaking, their topography is

that of a plain about three-quarters of a mile in width; two and one-half miles in length, rising by grade from the Ohio River to the foothills. Toward the east, the territory is connected with the rest of the city of Cincinnati by a narrow neck of ground about a quarter mile in length, extending some three to four miles to the nearest area of population known as Riverside.

The main highway of the villages is known as Lower River Road, constituting a part of U. S. Highway No. 50. The main line of the St. Louis division of the Big Four and the B. & O. Railroads traverse the area along the Ohio River.

The railroad area has a sea-level elevation of 485 feet, which elevation in this territory is subject to overflow by the Ohio River when the river at Broadway in the city of Cincinnati shows a stage of 63 feet. The territory immediately adjacent to Lower River Road is above high water flood elevation except in the portion at the extreme west or north-west end, where the road enters into the depression constituting what is known as Muddy Creek Valley.

The property in question herein, known as No. 7469 Lower River Road and which is the subject of this prosecution, is situate on the south side f Lower River Road between Wayne Avenue and Undercliff Road, which is at the extreme western limits of the former village of Fernbank, now the city of Cincinnati. Several hundred feet west of Undercliff Road, Lower River Road is crossed by Muddy Creek, which flows southwardly and empties into the Ohio River. The western boundary of Cincinnati crosses Lower River Road in the vicinity of Muddy Creek. The Ohio River is situated south of Lower River Road, the distance of Wayne Avenue being approximately five hundred feet, and at Muddy Creek and Lower River Road it is about eight hundred feet distant from Lower River Road. This territory is principally lowland and subject to overflow in times of high water. Midway between Lower River Road and the Ohio River are located the main tracks of the St. Louis division of the Big 4 Railroad and the B. & O. Railroad Company.

With the exception of the lots fronting on the south side of Lower River Road, the lowlands have been placed in the so-called "Industrial B" district. Immediately west of Muddy Creek and the west corporation line of Cincinnati is the industrial district of the Village of Addyston, the chief industry being the United States Pipe and Foundry Company, whose grounds abut Muddy Creek on the west. This Plant employs at times from five to eight hundred men. The lots fronting on both sides of Lower River Road, between Wayne Road and Muddy Creek, appear on the zoning map of the city of Cincinnati in the "Residence B" district, and as above stated, the property in the rear of the lots fronting on the south side of Lower River Road is zoned as "Industrial B" district.

The property in question herein is located on the south side of Lower River Road, approximately five hundred feet west of the intersection of Wayne Road, and is about one hundred and fifty to two hundred feet east of Undercliff Road. No residence has been erected upon the south side of Lower River Road between Wayne Road on the east and Muddy Creek on the west in a period of fifty years last past. The only buildings located on the south side of Lower River Road between said points is the house on the property in question, which was originally constructed as an ice-house, and the building used by the Fernbank Building Materials Company, which previously was used as a tobacco barn and which is located at the southwest corner of Muddy Creek and Lower River Road. East of the warehouse of the Fernbank Building Materials Company is located a railroad switch connecting with the main tracks of the steam railroad above referred to. This switch at one time crossed Lower River Road and connected with the property on the north side of Lower River Road. This switch is used now to supply freight cars to the building materials company. The record shows further that the building on the property on the north side of Lower River Road, first east of the corporation line, has been converted into a residence and was formerly used as an office for the building material company above referred

to. Between the railroad spur or switch and the property in question herein on the south side of Lower River Road there are no improvements. A stable was recently removed from the territory immediately adjacent to the spur track. On the lot adjoining the locus, on the east, is located the loop of the Cincinnati Street Railway Company. This loop forms the terminus of the street car route extending to Fernbank. This loop is located on private property which was formerly the right of way of the Cincinnati, Lawrenceburg and Aurora Street Railway Company, whose line of railway extended across Lower River Road at that point and continued on to the villages and towns of south eastern Indiana. A bus line connects with the street car loop at this point and interchanges passengers throughout the day. Street cars arrive at the loop at half hour intervals from 5:30 a. m. until 12 o'clock, midnight. The cars so arriving lay over at this terminus for short periods of from five to fifteen minutes. Buses arrive at this terminus to meet the passengers alighting from the street cars and also deliver passengers to the street car. These buses park along the roadway and wait to make connections with the street cars. Between this street car line and Wayne Avenue on the south side of Lower River Road is about four hundred feet of vacant land. On the north side of Lower River Road, between the street car line on the east and Muddy Creek on the west, there are but two dwellings and each of these dwellings are on large lots and set back a goodly distance from the street. West of the Fernbank Building Material Company's warehouse and lumber yard the property on both sides of Lower River Road is included in the "Residence B" district, although same is subject to overflow in times of high water and by reason thereof unfit for residence purposes.

Much of the record is devoted to a description of the reasons for zoning ordinances and the general application of the zoning ordinance of the city of Cincinnati. That the principles of zoning are considered sound and of public benefit is evidenced by the fact that there are approximately one thousand municipalities throughout

the United States comprising forty-five states of the Union, representing a population of almost 50,000,000 people, where zoning ordinances are in effect. Tracing the development of zoning since 1916, when the first comprehensive ordinance regulating building was adopted in New York city, we find the courts upholding the right to establish zones for building usages so long as they do not violate the constitution of the state and federal governments.

There is no question but that the city of Cincinnati has the right to establish zones for building uses and purposes and that it may restrict certain areas to certain usages so long as these restrictions are not arbitrary, unreasonable, unjustifiable and do not constitute an abuse of the powers vested in the city to create such zones.

The constitutionality of the Cincinnati Zoning Ordinance as a whole has been unquestionably established by the Supreme Court of the state of Ohio and there is no question but that the ordinance as a whole is constitutional. The real question before the court at this time is whether or not the testimony in the instant cases shows that the business operated by the defendants as a restaurant does or does not bear a real or substantial relation to the health, safety, morals, convenience, or general welfare of the inhabitants of that part of the city of Cincinnati.

The authorities specifically point out that where, in a given case, it appears that the use restriction imposed by the ordinance as applied to a particular piece of real estate bears no substantial relation to the public health, safety, morals or general welfare, such use restriction constitutes an invasion of private property rights prohibited by both the state and federal constitutions.

This principle is established in the case of *Seattle Trust Company* v. *Roberge,* 278 U. S., 116; also *Euclid* v. *Ambler,* 272 U. S., 365. In the case of *Pritz* v. *Messer,* 112 O. S., page 628, the court upheld generally the municipality's power of zoning, but held that the property owner had a right to construct a building as though his

property had not been zoned so long as it did not affect the safety, morals, public convenience and welfare, etc. The court in that case uses this language:

"It is easy to imagine ordinances enacted under the assumed authority of the proposed act which would exceed the constitutional limits of the police power and be an indefensible invasion of private rights * * *. Cases of that sort must be dealt with if and when they arise."

The outstanding case dealing with the question at issue here is that of *Nectow* v. *Cambridge,* decided by the Supreme Court of the United States and reported in 277 U. S., 185; Syllabus 1 of the *Nectow* case being as follows:

"The governmental power to interfere by zoning regulations with the general rights of the landowner by restricting the character of its use is not unlimited, and, other questions aside, such restrictions cannot be imposed if they do not bear a substantial relation to the public health, safety, morals or general welfare."

Syllabus 2:

"An owner of property which borders on factories with railroad tracks near is unconstitutionally deprived of his property without due process of law by zoning it into the residential class for which it cannot be profitably used, where such action will not promote the health, safety, convenience and general welfare of the inhabitants of the part of the city affected."

This same reasoning and principle has been applied by the Court of Appeals of Hamilton county in the case of *Mehl* v. *Stegner,* decided July 7, 1931:

"If the ordinance discloses no purpose to prevent some public evil or to fill some public need and has no real or substantial relation to the public health, morals, and safety, it must be held void."

The record in this case disclosed that if the defendants are not permitted to use their property for business purposes it would mean a considerable loss financially.

The record further discloses that it would not be financially advantageous to rent the property for resi-

dence purposes and that there is a need for a business such as that conducted by Grace Phelps, which is established by the fact that many requests to operate a business in that vicinity have been made and further that the business of the defendant, Grace Phelps, is being conducted advantageously. The court is obliged to find from the record that unless the property is permitted to be used as business that it will be to the financial disadvantage of the owners. This point, however, is not all-inclusive, but considered together with the fact that the record proves the operation of this business does not bear a substantial relation to the public health, morals, convenience and public welfare of the inhabitants of the immediate vicinity makes the zoning ordinance as it applies to the property in question unreasonable, arbitrary, unjustifiable, and, in the opinion of the court, constitutes an abuse of the power vested in the city authorities and deprives the defendants of property rights which are guaranteed to them in Article 1, Sections 1 and 19 of the Constitution of the state of Ohio and the 14th Amendment of the Federal Constitution.

The court has recited at length the facts shown by the record as to the topography, usage, and general condition of the property in the vicinity of the premises in question which for the purpose of this opinion constitute a "Finding of Fact."

It certainly cannot be argued that a small restaurant such as the defendant, Phelps, operates, where food and soft drinks are provided, can in any measure be as undesirable as a street car loop upon which cars turn every thirty minutes of the day except from twelve midnight to five o'clock a. m. In fact, the record fails to disclose any conditions created by the defendants business which causes any inconvenience to the citizens in the adjacent territory.

In their opening statement counsel for the city urged the court to convict the defendants because they did not deny operating a business in a residence zone. They insist, without producing any authorities, that if the defendants desire to operate their business they should

proceed with an injunction suit in the Common Pleas Court, and that they cannot raise a constitutional question in this court.

This court is unable to appreciate such a contention. It would be a rather sad miscarriage of justice to convict the defendants in the Municipal Court which would remand them to jail in event they were unable to pay the fine assessed, and at the same time have an injunction suit decided in their favor in the Common Pleas Court.

The city chose to enforce the ordinance in question as it applies to the defendants' property by causing their arrest and it is the duty of this court to hear their defense. If the contention of counsel for the city be correct and the defendants cannot be given the benefit of their constitutional rights in this cause then the Municipal Court becomes a rubber stamp to convict regardless of constitutional guarantees and valid defenses.

If the facts disclose the ordinance to be unconstitutional as it applies to the defendants' property, then no offense has been committed. The Supreme Court of Ohio, in the 95 O. S., 407, uses this language:

"An offense created by an unconstitutional law is not a crime: a conviction under it is not merely erroneous, but is illegal and void and cannot be a legal cause of imprisonment."

Our Supreme Court states the principle that an unconstitutional law is in reality no law. It is, in legal contemplation, as inoperative as if it had never been passed and since an unconstitutional law is void, it confers no rights, imposes no duties, creates no offices, affords protection to no one and will not be enforced by the courts. *State, ex rel. Allison,* v. *Garver,* 66 O. S., 555; *State, ex rel. Cline,* v. *Vail,* 84 O. S., 399; *State, ex rel. Bambach,* v. *Markley,* 9 O. C. C. (N. S.), 561."

It has been contended by the counsel for the city that the constitutionality of this ordinance, as it applies to this particular piece of property, cannot be raised by the defendants in this proceeding. In the case of *Fike* v. *State,* 40 C. C. (N. S.), 81, the court states:

"It is generally true that a defendant in a criminal case has the right to raise the question of the validity of the law under which he is prosecuted at any time."

The facts as presented by the record in this case disclose, beyond all question of doubt, that the use of the property in question for business purposes does not bear a substantial relation to the morals, health, convenience, or public welfare to the immediate vicinity:

That under the authority of both the Supreme Court of the United States and the Supreme Court of Ohio, the zoning ordinance of the city of Cincinnati, the violation of which these defendants are charged, must be held to be unconstitutional as it applies to the particular piece of property in question.

The defendants are both dismissed.