**STATE ex rel. SYNOD OF UNITED LUTHERAN CHURCH v JOSEPH et**

Ohio Appeals, 2nd Dist.,
Franklin Co.

No. 3274. Decided April 17th, 1941.

McFadyen, Swisher & Warden,
Columbus, for relator.

318

Lawrence D. Stanley, Columbus, for respondents.

OPINION

BY THE COURT:

This is an action in which relator prays the Court to mandamus the respondents, as members of the Zoning Commission, the Village Commission and the Building Inspector, all of the Village of Upper Arlington, Ohio, to issue a special permit to relator to erect a church on lots Nos. 13, 14, 15, 16, 17 and 18 in block 163, Kingswood Subdivision of Upper Arlington, according to plans and specifications submitted to respondents in conjunction with the application for said permit.

On April 30, 1940, relator acquired the lots heretofore set out, referred to in the record as "Site No. 3", from the Upper Arlington Company, paying as the purchase price therefor the sum of $8,250.00. Lots 14, 15, 16 and 17 face on Northwest Blvd., lot 13 faces Glen Avenue and lot 18 faces Westwood Avenue. Lots 13 and 18 abut lots 14, 15, 16 and 17 on the rear for their full length so that relator now owns the six lots in one block, which tract has a 269 foot frontage on Northwest Blvd., which is to the north, extending 209 feet south on Glen Avenue, which is to the west and 192 feet south on Westwood Avenue, which is to the east. After the acquisition of the lots, the relator made application to respondent boards for a permit to use said lots for the purpose of erecting

a church thereon, which application was refused by respondents on May 6, 1940. Thereafter, on June 10, 1940, plans and specifications for the proposed church structure were submitted to respondents with request for a building permit to erect a church upon the aforesaid lots and on June 24, 1940, this request was refused.

The Village of Upper Arlington is zoned by an ordinance, known as No. 219, enacted in 1927 and the refusal to grant the permit requested by relator was predicated upon Section 5 of said ordinance.

In November, 1939, relator took an option upon four lots and a part of a fifth lot located at the northwest corner of Northwest Blvd. and Barrington Road in the Village of Upper Arlington and thereafter petitioned respondents for a permit to erect a church building upon this site, which was refused. These lots throughout the record are referred to as "Site No. 1". Thereafter, on February 24, 1940, relator took an option on another group of lots in the Village of Upper Arlington, diagonally across the street from the first site, which is referred to throughout the record as "Site No. 2". Relator requested the respondent commissions to issue a permit to it to use the second site for a church building, which was on the 10th of April, 1940, refused.

At the time of the refusal for permit to erect a church building on "Site No. 2" the Commission on April 10, 1940, adopted the following reolution:

"Members of both commissions were of the unanimous opinion that church groups desirous of locating in this Village should be given every consideration and assistance in finding sites for their respective church structures that would be desirable and at the same

time raise the least objection from the property owners in the immediate vicinity."

Thereupon, Mr. Fisher offered and moved the adoption of the following resolution, which was seconded by Mr. Griffith:

"Be it resolved that in our present judgment the following sites on Class 1 property would be suitable and appropriate for the erection of churches: Sites 1—lots 13, 14, 15, 16 and 18 in block 163. Site 2—lots 10, 11, 12, 13, 14 and 15 in block 164, and with any request for a church on either site shall be an agreement to maintain 30% of the acreage inside the setback lines as a parking lot, which lot shall extend to the setback lines; also a satisfactory agreement regarding the use of bells, chimes," etc.

"The roll was called. Ayes, Messrs. Fisher. Griffith, O'Brien. Joseph. Nos, Mr. Rairden. Motion passed."

Thereafter and before the meeting of respondent boards of May 6, 1940, the relator addressed a communication to respondent boards and in connection with the application for permit to build on the aforesaid lots, stated that complete plans and specifications would be provided; that any addition made to the church structure that may be contemplated or requested in the future shall, in architecture and materials, be the same as the present proposed building and that any other building erected upon the premises shall be for church purposes and shall be connected to the principal building as the commission so desires and agreed that no bells or chimes shall be installed in the tower.

Further agreed that all requirements as to building restrictions, setback provisions, etc., would be observed and that 25% of the lot area in the site under consideration sufficient for 60 automobiles would be set aside and used for parking purposes for the use of the congregation.

The structure proposed to be erected is to be built of stone with tile roof, to seat 250 persons and to cost approximately $40,000.00. No objection has been urged to the material to be employed in the structure nor the type of architecture contemplated.

The relator does not attack the validity of the zoning ordinance in its general aspect, but claims that the respondents have acted arbitrarily in giving application to its terms in the situation here presented.

In (14) of respondents' answer it is averred that,

"Said ordinance 219 prohibits the erection of any structures except private residences in Class 1 zone except that the two said commissions in joint session may in their discretion allow churches and a few other specified structures therein. Furthermore, respondents aver that they have the right, before issuing a special permit to impose any reasonable conditions that they see fit with respect to type of structure, style of architecture, materials to be used, position on the premises, etc. Having such right, respondents in any event can not be compelled to allow relator to build the particular church described in its plans and specifications."

We agree with the respondents that their rights under ordinance 219 are in most particulars as set up in the heretofore quoted part of their answer, but question the assertion that the ordinance prohibits the erection of any structure except private residences in Class 1 zone.

The test upon respondents' own answer is, did they impose and apply reasonable conditions in the determination that relator should not be issued the permit requested. The action taken upon relator's application can be supported only upon the hypothesis that the respondents were of opinion that it was their right, independent of discretion, to refuse the erection in Class 1 of any structure other than single residences. This is the claim of their counsel as appears at page 65 of the record, "The zoning ordinance flatly forbids any structure except a private dwelling in Class 1 districts and any exception thereto is strictly a matter of grace on the part of the joint commissions and they are not legally bound under any circumstances to grant such a special permit", and likewise upon respondents' brief this is the basis upon which they refused to grant a permit to relator to erect a church on site 1, site 2 and site 3.

There is not the slightest specific suggestion at any time during the consideration of the respective applications that the refusal to grant the permits was predicated upon the encroachment of the church upon any easement rights of the village. On the contrary, the interpretation of the Zoning Ordinance is well set forth in the resolution of Respondent Boards of February 14, 1940, wherein it was stated that it would be inconsistent with the orderly plan of development set up by the Planning Commission to permit a church to be erected in Class 1 territory as long as Class 3 or business property is available and it was moved and carried that all applications for permits to erect churches in Class 1 district be refused. (Emphasis ours.) This unanimous action of the seven members of the Boards was equivalent to a determination that in their judgment no condition could be met which would support or authorize the issuance of a permit for the erection of any church in Class 1 district. We believe that this is an improper conception of the meaning and effect of the ordinance.

## THE ORDINANCE.

Ordinance No. 219 of the Village of Upper Arlington divides the village into four zones known generally as Class 1, single family house districts; Class 2, multiple family house districts; Class 3, retail business districts; Class 4, telephone exchange district.

The territory affected in this case is admittedly in Class 1 district. Section 5 of the ordinance provides:

"In Class I districts, single family dwelling houses only with necessary, proper and approved outbuildings and fences shall be permitted and such houses shall be ococcupied by not more than one family per house, 'family' being defined as any number of persons living and cooking together as a single housekeeping unit. Provided that any building heretofore erected or now in use within such district for residence of more than one family shall be permitted to continue in such use and that churches, schools, public libraries, public museums, community center buildings, public recreation buildings, private clubs or public parks and playgrounds may be erected and used within such district by special permit granted by the Zoning Commission and the Village Council who shall administer the ordinance as hereinafter provided for."

Section 6 provides:

"In Class 2 districts dwelling houses only (with necessary and

proper outbuildings and fences) shall be permitted and such houses shall be designed for the use of and occupied by not more than two families per house, 'family' being defined as in Section 5 provided * * *."

Section 7 provides:

"In Class 3 districts buildings and premises may be erected and used for retail stores, banks, offices, studios, telephone exchanges, fire stations, theaters (including moving pictures) halls, private clubs, restaurants, bakeries, gasoline filling stations or any building or use which in the opinion of the zoning commission is of a character similar to those enumerated in this section."

Section 7 (c) provides:

"In Class 3 districts all buildings and structures shall be fireproof in construction and all plans and specifications of such buildings and structures must be approved by the zoning commission before erection may commence."

Section 4 has application to one building only, which is the telephone exchange building now erected and located on Glen Avenue opposite relator's site.

It will be noted that the village is completely zoned and that the structures which may be erected and the uses employed in each zone are specifically set forth. There is no provision that a structure or use which does not come under the express language of Class 1 or Class 2 districts may be erected in Class 3 district. It is only those structures not mentioned in Class 3, except those permitted in Class 1 and 2, which in the opinion of the Zoning Commission are of a character similar to those enumerated in the section that may be included in Class 3 districts.

### CONSTITUTIONALITY.

The test of the constitutionality of a Zoning Ordinance as a whole or any part thereof is whether it bears any substantial relation to the protection of public health, safety, convenience, comfort, prosperity or general welfare. This is the language of our statute §4366-7 GC.

The leading case in America on Zoning is Village of Euclid, et al v Ambler Realty Co., 272 U. S. 365, in which case the court passed upon and sustained the validity and constitutionality of a general zoning ordinance creating residential districts and excluding therefrom apartment houses, business houses, retail stores and shops and other like establishments. The court very definitely asserts that it did not closely scrutinize the provisions of the ordinance to ascertain whether there may be minor provisions which, if attacked specially, would be held unconstitutional.

It is obvious that generally the operation of a church such as is recognized in our society, does not affect adversely public health, convenience, comfort, prosperity or general welfare of those who live in the vicinity thereof. May this church, in location or use, affect the convenience, comfort or safety of those who live in Upper Arlington?

It is worthy of notice that no court has approved an ordinance which in terms prevented the erection of a church in strictly residential territory, if expressly challenged. Bassett in his work on Zoning, pp. 70, 71, says that churches are so intimately connected with home life they should

be in home communities and in all the earlier ordinances they, like schools, were allowed in residence districts as a matter of right. It is common knowledge that in recent years hundreds of downtown church buildings have been completely surrounded by business establishments which has not been conducive to the welfare of the church and has generally resulted in marked decrease in attendance at stated services. This situation has resulted in many such churches removing to the purely residential sections of the cities wherein they are located. It is almost axiomatic that a church is associated with that part of a village or city wherein the residents have their habitation. So that, an ordinance which has for its purpose the complete prohibition of all such structures from strictly residential territory is unusual, to say the least.

In considering the constitutionality of this ordinance we are required to give force and effect to the 8th proposition of the syllabus in Village of Euclid v Ambler Realty Co., supra, that,

"The zoning ordinance must be clearly arbitrary and unreasonable and without substantial relation to public health, safety, morals or general welfare before it can be declared unconstitutional."

### SAFETY AND GENERAL WELFARE.

Northwest Boulevard is a main thoroughfare in the village of Upper Arlington, 100 feet wide, although but 40 feet of it is paved. It is conceded that the street is surfaced to accommodate heavy traffic. The traffic caused by the erection of the church may not be classified as heavy because it will be almost without exception that of passenger cars. There is, then, left but the one phase of the traffic problem, namely, congestion of cars in the vicinity of the church. The church building as contemplated will seat but 250 persons, occupying but a very small proportion of the six lots. The structure is placed to the side of the lots upon which it is to be erected, so that there will be left an area for the parking of 60 cars, in all probability enough cars to carry all who will regularly be so transported to the services of the church. If not, all other cars of persons who will attend this church could easily be parked with little congestion upon the three streets abutting relator's lots, namely, Northwest Blvd., Glen and Westwood Avenues. However, the village has within its power the right to restrict parking either on Glen Avenue, Westwood Avenue or Northwest Blvd., and to compel automobiles to be parked on the opposite side of Northwest Blvd., which is in Class 2 of the zoning ordinance.

Such increased parking as would result by reason of the church services would in the main occur on Sunday at a time when parking in the vicinity of the lots upon which the church would be erected would be greatly decreased.

What of the comfort of those who are domiciled in the vicinity of relator's site? It appears from the record that on Northwest Blvd., across from relator's site, there is an apartment house which is in Class 2 district. This building is at least 180 feet removed from the front of the church building. The Bell Telephone Company's building across the street on Glen Avenue is 100 feet removed and no objection is interposed as affects this structure. There is no residence building or structure of any kind in block 163 in which the lots comprising relator's site is located. On Northwest Blvd. on the south side and to the east of rela-

tor's site the nearest building is two squares away. The nearest residence on Westwood Avenue is in block 164 at the corner of Stanford Road and Westwood Avenue and is approximately 600 feet from the corner of Northwest Blvd. and Westwood Avenue.

## UNIFORMITY OF OPERATION.

A zoning ordinance may only be supported if there is uniformity in its classification of the use of buildings and structures to be erected within the created zones. If a zoning commission is given authority to permit the erection of a structure in a zone restricted to single family residences, the use of which is that which is clearly contemplated in buildings which are zoned in a less restricted district, the ordinance in █ probability would be invalid because not uniform in operation. Thus the zoning ordinance under consideration must have been drawn upon the theory that a church erected under proper safeguards was appropriate to be classified within a strictly residential zone and a fortiori such a structure would not be offensive to the public health, safety, convenience or general welfare of the community. As it was contemplated that churches might be erected in zone No. 1 of the Upper Arlington ordinance it follows that such structure was not offensive in any particular defined in the statute if it meets the requirements of the zoning commission. What, then, may those who desire to erect a church be expected to do, what requirements must they meet? These are interesting questions in the light of the situation presented on this record.

Here is an organization representative of an orthodox Christian church whose tenets of faith and religious practices are well known. It is not given to any modern phases of experimental religious practices which in themselves might be unpleasant but conforms to the conservative type of religious services. Such an institution, all must recognize, even as the members of the respondent commissions at one time recognized, should be encouraged to locate among the residents of Upper Arlington. Every reasonable effort has been made to conform to the requirements of the village commissions. There are no sites available for the proposed church in Class 2 or 3 under the zoning ordinance in the village. But it is said individually by certain members of the commission that they would be willing to re-zone certain territory so that it might be available to relator for the erection of its church. Of course, in view of its experience following the resolution of April 10, 1940, the commission would be free to act as its members desire, when and if the question of re-zoning is properly before it.

## OBJECTIONS TO PERMIT.

One of the reasons urged against the granting of the permit is that the erection of the church will depreciate values. This, of course, can not be a valid reason in itself. The purchase of the lots by individuals of undesirable repute would have the same effect if they built single family residences and lived in them in conformity to all of the provisions of the █ zoning ordinance. The aesthetic effect of a church may not alone operate to support its exclusion.

If the ordinance required the limited construction urged by respondents we would seriously question its constitutionality, but we have no hesitancy in holding that it is constitutional upon the inter-

pretation which we believe is required by its letter and spirit.

## INTERPRETATION OF SEC. 5.

The ordinance in its entirety evinces a purpose, to permit the erection of churches in Class 1 districts. The ordinance is constitutional in its general aspect, but it must be determined whether or not the respondent boards acted reasonably in interpreting it as relates to the specific question before them. It was appropriate that the ordinance throw safeguards about the erection of a church, which was accomplished by placing certain discretionary power in those boards which were authorized to grant a permit for such erection. Section 5 of the ordinance expressly states that churches may be erected and used within such district (Class 1) by special permit granted by the Zoning Commission and the Village Council. The right to erect a church in Class 2 District likewise grows out of and is grounded upon Section 5, and there is no other or further provision respecting the erection of a church in Class 2 District, except Section 3 which says that all buildings and structures **permitted** in Class 1 shall be permitted in Class 2 and Class 3 Districts and all such permitted in Class 2 shall be permitted in Class 3. (Emphasis ours.)

Section 7 specifically names those buildings and premises which may be erected and used in Class 3 districts and there is no mention made by name of any one of the structures which Section 5 recites may be erected in Class 1 districts by permit, namely, churches, schools, public libraries, public museums, community center buildings, public recreation buildings, private clubs, public parks and playgrounds, except private clubs. The only means by which a church may be read into Section 7 is by the language following the specific designation of buildings and premises, namely, "or any buildings or use which in the opinion of the Zoning Commission is of a character similar to those enumerated in this section". Had those who framed the ordinance intended that "churches" should be erected in Class 3 district by virtue of Section 7, it is inconceivable that they would not have mentioned them by name.

It is asserted that a church may be erected in Class 3 district because it is a structure similar to a hall. This construction would be permissible if churches in Section 5 were not tied up with other designated structures and uses all of which are upon the same basis under the section.

It would be difficult for the Zoning Commission to find any designated structure or use mentioned in Sec. 7 which would be of a character similar to "public parks" and "playgrounds" named in Section 5. If such similarity could not be found then there is no provision whatever in the ordinance for the placing of public parks and playgrounds unless they are permitted under Section 5 in which event Section 3 would apply.

If in the future the lands in the village now owned for public school purposes should become insufficient and more territory be required, upon the interpretation of the board, in its resolution of February 14, 1940, a permit could not be issued for the purpose of erecting a school building either within Class 1 or Class 2 districts and the school building would be relegated to Class 3 or business district. This necessarily is true because "schools" is specified immediately following "churches" in Section 5 in defining the buildings that may be erected and the uses which may obtain

under the permit to erect, provided in said section. This is convincing that it was contemplated that all of those buildings and uses designated in Section 5 were to be erected and employed in Class 1 districts upon permit.

Section 7 (c) provides that all buildings and structures in Class 3 districts shall be fireproof in construction and there is no authority granted to any board to waive this specific requirement. So that, if the relator is remanded to Section 7, as urged by respondents, for the right to erect its church, and could find a suitable site in Class 3 district and would pay the higher price for such land, it would further be required to build a fireproof church. It is improbable that such is the intent of the ordinance as a whole. ·

It is our judgment that Section 7 (c) relates to those buildings and uses named and included in Section 7 and they only are required to be fireproof. Those buildings and uses which are permitted in Class 1 and Class 2 districts and, therefore, come under Section 3 may, as a matter of right, be placed in Class 3 district and are not required to be fireproof. This construction is possible only upon the theory that it is contemplated by the ordinance that churches and like structures mentioned in Section 5 may be erected in Class 1 and Class 2 districts, by virtue of said section, under proper and reasonable requirements.

There can be no doubt of the good faith of the parties to this action as evidenced by the transactions appearing in the record. The resolution of the boards of April 10, 1940, must have been passed upon the conviction that, if and when the conditions therein set forth were met there would be no valid objection to the erection of a church upon the lots suggested as a suitable site. The resolution took cognizance of the possible objectionable features that might be urged against the granting of a permit to build the church upon the lots suggested, namely, the use of bells, chimes, etc., and particularly the parking problem which it was suggested would be met by an agreement to maintain 30% inside of set-back lines as a parking lot. This resolution evinced a fine appreciation of the meaning of the ordinance and the duties of the board prerequisite to the issuance of the permit. All of the conditions were met by the relator in the plans set forth in connection with the application for permission to erect the church on site No. 3.

Subsequent to this resolution of April 10, 1940, it appears that certain members of the respective boards were disturbed because of rumors and a newspaper article that relator intended to erect other structures than the church upon the lots purchased by it. The record is convincing that when the application for permit came before the boards there was no basis whatever for the claim that the relator intended to build anything other than the proposed church upon the site.

### EASEMENTS.

Respondents in their answer assert that plans and specifications submitted by the relator on June 10th show the church located over a public easement reserved for the use of the village and public utilities. The reply asserts that in the deed for the property described in the petition there was the following proviso:

"This deed is also made subject to an easement and right of way in, over and through so much of said premises as lies within 5 feet on each side of a line or lines

marked 'easement' on said plat, now used by public utilities, which easement and right of way shall terminate and be of no further effect upon the abandonment thereof by the public utilities operating therein."

It is further averred that,

"The only public utilities now operating therein are the Ohio Bell Telephone Company and the Columbus and Southern Electric Company, both of which public utilities have agreed to abandon and release said easement and relator has offered and agreed to provide an easement for public service and utilities along the southerly part of the aforesaid property; that the re-location of the easement will not interfere in any way with the use to the public by any public utility or service."

"If it should appear that there is a public easement which can not be legally terminated without prejudice to the public, which relator expressly denies, then relator agrees to locate its church building upon said lots so as not to violate and prejudice any rights which the public and other lot owners in the subdivision may possess."

"Respondents have never raised any objection to the submitted plans and specifications nor have they specified any conditions whatsoever with respect to the type of structure, style of architecture, materials to be used, position on the premises. etc., but have merely contented themselves with refusing to issue any permit for any church structure whatsoever upon Class 1 property."

The evidence establishes that the church, if erected as set forth in the plans and specifications would extend over the easement along the rear of certain of the lots facing Northwest Blvd., and an easement along the side of lot 13 and the rear of lot 18. The only utilities that are now available to the territory affected are water, electricity, telephone and gas. Sewer lines are also involved. The water mains are placed in the streets and would not be affected at all by the erection of the church as proposed.

As we understand it, the sewer as now set forth on the plan ends at the junction of lots 15, 16, 13 and 18, all of which are owned by relator. So that, the service provided by the sewer as planned in the plat of the village could and will accommodate only the relator in the territory affected. There are some poles which carry wires conducting electric energy upon the premises described in the petition which will have to be moved and it will be necessary for the Village to arrange to cross one of the streets with the light poles at a different place than now. The record supports the averments of the reply to the effect that the Bell Telephone Company and the Columbus and Southern Ohio Electric Company have agreed to abandon and release their right to use the easement appearing in the plat of Upper Arlington and it further appears that the Ohio Fuel Gas Company has by formal conveyance released its right of way easement along land so set apart upon the plat of the Village and has placed its line at another location along and through relator's land.

In the dedication of the Upper Arlington Company's Kingswood Subdivision, in which are located relator's lots, the following is the only subject matter referable to easement:

"Brown dash lines, marked 'Easement', indicate the boundaries of easements ten feet in width, being

five feet on each side of lot lines, which will be reserved in the deeds for said lots, for pole lines, pipe lines, conduits, etc., used and to be used for public and quasi-public services. So long as the easements to be reserved along side lot line (but not including easements to be reserved along rear lot lines) are not used for pole lines, pipe lines, conduits, etc., the right is hereby reserved to change said side lot line easements, or any one or more of said side lot line easements, to other locations."

If the Village has rights in the easements over and beyond those of the Upper Arlington Company and its grantee, the relator, it is upon the theory of uniformity in location of public utilities and as-surance that all who own lots con-tiguous thereto would be afforded utility service. The Village general-ly has such rights.

It is our judgment, however, that they will not be adversely affected by the change of the easement lo-cation, as proposed, inasmuch as the relator owns all of the lots in block No. 163 of the Kingswood Subdivision facing on Northwest Blvd., 14, 15, 16 and 17, lot 13 facing on Glen Avenue, and lot 18 facing on Westwood Avenue, the north lines of which lots form the south boundary lines of the lots 14, 15, 16 and 17.

In the doctrine of private ease-ments when the dom-inant and servient es-tates are merged the easement right is vested in the owner of the two estates.

King Thompson who is most fa-miliar with the Upper Arlington plat testifies that no lots in the block, in which relator's lots are located will be denied any utility service by reason of the changes necessitated by the location of the church as planned. We are satis-fied that the objection to the granting of the permit upon the claim that easement rights would be vio-lated is not of sufficient substance under all the facts appearing to justify this Court in refusing to grant the relief sought.

The writ may issue as prayed.

GEIGER, PJ., BARNES and HORN-BECK, JJ., concur.