Hugh S. Coyle, J.
This action was tried before the court without a jury. Plaintiff herein seeks to have declared unconstitutional, illegal and void two (2) zoning ordinances adopted by the defendant, Village of Briarcliff Manor. In addition, it is sought to enjoin the defendant, North American Philips Company, Inc., from proceeding with the construction of any building upon the premises to which the ordinances have been directed and to permanently enjoin the defendant village, its officers, agents, servants and employees from authorizing or permitting said North American Philips Company, Inc., to construct any buildings upon the premises in question.
The plaintiff Rogers is the owner of approximately 21 acres of improved land in the Village of Briarcliff Manor situate on the westerly side of Scarborough Road at its junction with Holbrook Road. The plaintiff Moss Estate, Inc., is the owner of an unimproved parcel of land 23 acres in extent, adjoining the Rogers’ property along the westerly portion of the southerly boundary of Rogers’ land and extending south and west therefrom. Both plaintiffs have been the owners of the land described above for upwards of 30 years.
Defendant David Swope was the former owner of the premises in question, which was a part of the former Speyer estate in Briarcliff Manor. On or about June 7, 1962, the defendant Swope conveyed approximately 91 acres of unimproved real property to the defendant, North American Philips Co., Inc., hereafter referred to as N. A. P., pursuant to a prior agreement between said defendants. The defendant, Village of Briarcliff Manor, hereinafter referred to as the Village, is a municipality duly incorporated pursuant to the laws of the State of New York.
On November 1,1961, an application was filed with the Village by N. A. P., as contract vendee, requesting a change of zone covering approximately 74 acres of the original 91 acres it subsequently purchased from defendant Swope. The change sought was from “ Single Family Residence R-40 A District ’’’ to ‘1 Planned Office Building and Laboratory B District ’ ’. In accordance with the provisions of section 4 (A) of the Zoning Ordinance, the Planning Board held a public hearing on said application on December 11, 1961. On December 19, 1961, the Planning Board submitted to the Board of Trustees of the Village written recommendations that the application be granted. The Board of Trustees of the Village received said written recommendations of the Planning Board on December 27, 1961, *925 and thereafter held a public hearing on such application on January 25, 1962. On February 8, 1962, the Board of Trustees of the Village adopted a resolution granting the application of N. A. P., and adopted Ordinance No. 132, which amended the Zoning Ordinance and Zoning Map of the Village of Briar cliff Manor by classifying the 74-acre parcel of N. A. P. property as a 1 ‘ Planned Office Building and Research Laboratory B. District. ’ ’
The 74-acre parcel is bounded as follows: On the east by Scarborough and Holbrook Roads and by the back or rear lines of certain residential properties on the west side of Scarborough and Holbrook Roads; on the west by the Croton Aqueduct, which is at that point in the Village of Ossining; on the south by a single parcel zoned for residential use, but unoccupied since the residence on the property burned down some 25 years ago; and on the north by Holbrook Road and the rear lines of certain residential properties along Holbrook Road and by a 17-acre parcel simultaneously acquired by N. A. P., but not rezoned.
In about the year 1956 the Village decided that it should have a so-called master plan. The testimony indicated that at that time there were many problems facing the Village and that a master plan was required to afford the Village a basis upon which to provide for future development of the town and to cope with the many problems which were being presented to the Planning and Village Boards. The Village engaged the services of Theodore T. McCrosky, as a planning consultant to assist in the preparation and development of a master plan. Mr. McCrosky’s work was commenced in 1956 and was completed in 1958. Some of the reasons impelling the Village to enact a master plan were as follows: There was a lack of information on the part of the Planning Board as to what the residents of the Village wanted; the Planning Board had previously had very little professional advice of an unbiased nature from outside; the population in the Village over the five-year period preceding 1956 had increased tremendously; there were a number of large developments being considered and applications being made to the Planning Board for approval; Village facilities, such as sanitary sewers, water supply, fire protection, and police protection were being overburdened. Looking ahead to the future, the board was apprehensive as to the problems which would be presented relative to the development of several large estates, including the one in question; the Building Inspector was having difficulty under the loose terms of the Zoning Ordinance in enforcing the same; there were a number of possibilities of public and private schools seeking sites in the Village, especially in the light of the fact that a good portion of the Village land was *926 already devoted to schools of higher education hy the Briar cliff Junior College and the Kings College, and there was a proposed New York State and Berkshire Expressway being considered by the State Highway Department which might have affected the Village.
To obtain an expression of opinion of the residents of the Village, the Planning Board formulated a community survey questionnaire. A survey was made in January, 1957, conducted by the Planning Board with the help of the League of Women Voters. Thereafter the final results and tabulation of the community survey was considered and studied by the Planning Board, following which several joint meetings of the Board of Trustees and the Planning Board were held with the professional consultant McCrosky to discuss the development of the proposed master plan.
One of the recommendations included in the master plan was the creation of a new Office Building and Laboratory B District. This was recommended by Mr. McCrosky in his capacity as a planning expert in an effort to maintain the rural and open country character of the Village and to place reasonable and desirable restraints on the increase of population for the Village and more particularly on the population density. Further it was desired to achieve beneficial additions to the taxable assessment roll of the Village without entailing greatly increased costs of government; and it was sought to achieve a better balance of the Village economy.
Prior to the acceptance of the proposed master plan by the Planning Board, two public hearings were held on the proposals contained therein. The master plan was completed on or about February 13, 1958.
The Board of Trustees considered the revision of the Zoning-Ordinance in the form of three proposed ordinances, Ordinance No. Ill, No. 112 and No. 113. Ordinance No. 112 dealt with the adoption of section 4 (A) —the new Office Building and Laboratory B District. There was no opposition to the adoption of Ordinance No. 112 which created section 4 (A) of the Zoning Ordinance adopted on November 24, 1958.
Prior to the approval of the application of N. A. P. and the recommendation to the Village Board of Trustees the Planning-Board made a very careful review of the formal written application. Following this, it compared the application with the terms of the ordinance (§ 4 [A]) to see if there were any points at variance with the ordinance, and in general it considered the questions of topography of land, the slope and the proposals. In addition the Planning Board looked into such things as *927 reputation of 1ST. A. P. (all the members of the board made field trips to the N. A. P. present plant in Irvington), its financial standing, the kind and type of operation it was conducting and what it planned or proposed to construct in Briarcliif Manor. Following this, a public hearing was held by the Planning Board on December 11, 1961, which was well attended. All persons interested were given an opportunity to be heard. A major objection was the traffic problem, as expressed by those attending the meeting. Following the meeting, each member of the board personally inspected the premises, the chairman having made in all between 12 and 14 visits to the site to determine how this application might affect the neighbors, and how the location of the entrance — etc. — might best be accomplished in relation to the buildings proposed. The members of the board personally visited the premises at four critical times; during the greatest commuter traffic as it exists in the morning, and later at the proposed hours that the laboratory would open its doors, and then at the same times in the evening. A traffic study which had been made by Wilbur Smith Associates (traffic engineering firm) was considered and at a subsequent public meeting held on December 18, 1961 Mr. L. E. B. Atwater, a traffic engineer with Wilbur Smith Associates, was questioned extensively on this feature. Written reports were received, filed and considered from the Village Police Department, the Village Fire Department and the Village Engineer. In arriving at the decision to approve the application, it must be stated that due and full consideration was given to each and every aspect of the application and its effect upon the immediate neighborhood and the Village as a whole.
The Village Board of Trustees went over the same ground covered by the Planning Board in their consideration of the application, and like the Planning Board, considered, prior to granting the application by the adoption of Ordinance No. 132, the following items and facts among others in connection therewith: traffic, drainage, water and sewer; type of individuals to be employed; use of the premises beyond nine to five working hours; setback and type of construction, screening and aesthetics of building, access roads, open land aspects, possible other uses of the property; experience in other cases, whether there would be any devaluation of adjoining properties due to laboratory use, the percentage of Village land already tax exempt; visits by the Mayor and Board of Trustees to the site; noise nuisance and other factors detrimental to the area; present condition of site; development of laboratories and office building; buildings in other municipal areas in Westchester County; *928 financial condition and stability of N. A. P.; the effect on the Village tax rolls; expert opinions and recommendation of the Village Planning Board.
The above is not intended to be a complete outline of what steps were taken by both the Planning Board and the Village Board in connection with the investigation and consideration given to the application of 1ST. A. P., as testified upon the trial, but is stated as indication of the fact that the action taken was reasonable under all the circumstances, with full knowledge of the problems involved.
In Place v. Hack (34 Misc 2d 777, 781) it is stated: “ the evidence shows that they [the board] were acquainted with the situation at hand, that they considered the varied aspects of the . problem with some thoroughness, and that they came to a deliberate conclusion. It is important to note that the board acted unanimously. * * * Clearly the board did not act arbitrarily or capriciously.”
It is the contention of the plaintiffs that the two-step zoning-technique which was used by the Village in the instant case, is in violation of the controlling provisions of the Village Law. In Rodgers v. Village of Tarrytown (302 N. Y. 115) it was made clear that a municipal legislative body may accomplish its zoning purpose in two steps as well as in one. Judge Ftjld, writing for the majority of the court, said (pp. 125-126):
“ We turn finally to the contention that the 1947 ordinance is invalid because, in proclaiming a Residence B-B district, [permitting garden apartments] it set no boundaries for the new district and made no changes on the building zone map. The short answer is that, since the ordinance merely prescribed specifications for a new use district, there was no need for it to do either the one or the other. True, until boundaries are fixed and until zoning map changes are made, no new zone actually comes into being, and neither property nor the rights of any property owner are affected. But it was not the design of the board of trustees by that enactment to bring any additional zone into being or to affect any property or rights; the ordinance merely provided the mechanics pursuant to which property owners might in the future apply for the redistricting of their property. In sum, the 1947 amendment was merely the first step in a reasoned plan of rezoning, and specifically provided for further action on the part of the board. That action was taken by the passage of the 1948 ordinance which fixed the boundaries of the newly created zone and amended the zoning map accordingly. It is indisputable that the two amendments, read together as they must be, fully complied with the require *929 ments of the Village Law and accomplished a rezoning of village property in an unexceptionable manner.
“ In point of fact, there would have been no question about the validity of what was done had the board simply amended the General Zoning Ordinance so as to permit property in Residence A and Residence B zones — or, for that matter, in the other districts throughout the village — to be used for garden apartments, provided that they were built on ten-acre plots and that the other carefully planned conditions and restrictions were met. It may be conceded that, under the method which the board did adopt, no one will know, from the 1947 ordinance itself, precisely where a Residence B-B district will ultimately be located. But since such a district is simply a garden apartment development, we find nothing unusual or improper in that circumstance. The same uncertainty — as to the location of the various types of structures — would be present if a zoning-ordinance were to sanction garden apartments as well as one-family homes in a Residence A district — and yet there would be no doubt as to the propriety of that procedure. (See Nappi v. La Guardia, supra, 295 N. Y. 652, affg. 269 App. Div. 693, affg. 184 Misc. 775.) Consequently, to condemn the action taken by the board in effectuating a perfectly permissible zoning scheme and to strike down the ordinances designed to carry out that scheme merely because the board had employed two steps to accomplish what may be, and usually is, done in one, would be to exalt form over substance and sacrifice substance to form.” (Emphasis supplied.)
In Thomas v. Town of Bedford (11 N Y 2d 428) the Zoning Ordinance creating the ‘ ‘ RO ’ ’ district did not specify its location in the town. The plaintiff there did not question the validity of the town’s method of zoning by two steps. Indeed, the fact that no specific locations were prescribed for an RO district created in the town for about five months is merely noted in passing- in the unanimous opinion of the Court of Appeals, by Fuld, J. (pp. 432-433): “ New studies and reports were made and hearings held and in October, 1959 the Town Board amended the 1946 zoning ordinance to establish an RO district, and the Planning Board recommended three areas, one of them being the subject property. Considerable opposition developed — part of it based on the incomplete status of a Town Development Plan which had been in progress for some years. However, the Town Board did no more than postpone decision on the matter in order to revise and make more strict the provisions relating to access and area requirements. Finally, on March 8, 1960, after a public hearing, the Town *930 Board unanimously adopted a resolution rezoning the subject property for BO purposes ”.
This court is of the opinion that the two-step zoning, sometimes referred to as “ floating zone ’ ’ is lawful and that the test of the lawfulness of the change of zone here questioned is whether the two steps “ read together as they must be, fully complied with the requirements of the Village Law'' (Rodgers v. Village of Tarrytown, supra.) As has been pointed out above, the Board of Trustees of the Village of Briarcliff Manor have indeed carefully complied with the requirements necessary in both steps.
It is urged by the plaintiffs that the rezoning was not enacted for any of the purposes permitted by section 175 of the Village Law, to wit: “ promoting the health, safety, morals or the general welfare of the community ”, and that it did not comply with section 177 of the Village Law for the reason that it was not made in accordance with a comprehensive plan and was not an ordinance designed to accomplish the objectives enumerated in section 177 of the Village Law, or any one of such objectives.
There is ample evidence in the record to show that the purpose of the Village in enacting both section 4 (A) and Ordinance No. 132 was to move towards the objectives permitted by the Village Law and that the change in zoning here complained of was reasonably calculated to achieve them.
In addition to a review of the testimony, the court in company of counsel for all parties visited the premises in question, including the property of the plaintiffs as well as the surrounding area in general.
From the testimony adduced and the area observed, the court finds that the Village Trustees reasonably concluded that the 1ST. A. P. laboratory would be most likely to preserve the premises as a park-like area, retaining many of the old trees, and restoring and improving the landscaping which over the years had deteriorated. Furthermore, the building which is now proposed would be some 1,100 feet back from Scarborough Bond, with side setbacks many hundreds of feet greater than the minimum permitted under section 4 (A) and located in such a position and location as to preserve the many large trees on the property. While it appears from the record that the Trustees considered the aesthetics of the planned building, it also considered a location for same upon the premises which would make it difficult to be seen from both Scarborugh and Holbrook Boads. It should also be pointed out that those residents of Briarcliff Manor most closely affected by the change of zone, who testified upon the trial, supported the judgment of the Trustees and *931 favored the change of zone. They felt in general that the rezoning will tend to preserve — -rather than destroy the rural character of the area, and they considered their properties more desirable following the rezoning to the proposed use.
Based upon the testimony given at the trial, it is difficult to find more which the board could have done by way of consideration, investigation and study of the problem at hand. Our courts have held that even if the validity of the legislative action of a board is fairly debatable, the judgment of the legislative body should be given the greater consideration and not upset by the court. In other words, the court should not substitute its judgment for that of the legislative body of the Village. (Levitt v. Incorporated Vil. of Sands Point, 6 N Y 2d 269; Rodgers v. Village of Tarrytown, supra; Thomas v. Town of Bedford, supra.) In the Thomas case it was stated (pp. 433-434): “In any area of even moderate density, comprehensive and balanced zoning is essential to the health, safety and welfare of the community (Town Law, § 261; Village Law, § 175). The task of achieving this goal devolves upon the local legislative body, and its ‘ judgment must be allowed to control ’ if the classification is ‘ fairly debatable ’. (Rodgers v. Village of Tarrytown, 302 N. Y. 115,121, quoting from Euclid v. Ambler Co., 272 U. S. 365, 388; see, also, Shepard v. Village of Skaneateles, 300 N. Y. 115, 118; Town of Islip v. Summers Coal & Lbr. Co., 257 N. Y. 167, 169, 170.) In other words, the courts may not interfere unless the local body’s determination is arbitrary and ‘ the burden of establishing such arbitrariness is imposed upon him who asserts it.’ (Rodgers v. Village of Tarrytown, 302 N. Y. 115, 121, supra.) ” (Emphasis supplied.)
The court finds that the plaintiffs have failed to establish that the action of the defendant Village in rezoning the premises of N. A. P. was unreasonable, arbitrary or capricious. Further, the plaintiffs have failed to show that the zoning amendments adopted by the Village were unconstitutional or otherwise invalid. Under the circumstances the complaint is dismissed and judgment granted to the defendants.