2010 OK CIV APP 128

**SAND SPRINGS MATERIALS LLC, an Oklahoma limited liability company, Plaintiff/Appellant,**

v.

**The CITY OF SAND SPRINGS, Defendant/Appellee.**

No. 106,736.

Court of Civil Appeals of Oklahoma, Division No. 2.

Sept. 3, 2010.

Certiorari Denied Nov. 1, 2010.

Sara C. Smith, James E. Weger, Jones, Gotcher & Bogan, P.C., Tulsa, OK, for Plaintiff/Appellant.

Kevin R. Nelson, Nelson and Ferraro PLLC, Oklahoma City, OK, David L. Weatherford, Birmingham, Morley, Weatherford & Priore, P.A., Tulsa, OK, for Defendant/Appellee.

JOHN F. FISCHER, Presiding Judge.

¶ 1 Sand Springs Materials LLC (SSM), appeals from the judgment of the district court upholding the decision of the City of Sand Springs to deny SSM a specific use

permit to operate a rock quarry. Because we find that the judgment appealed is not against the clear weight of the evidence, we affirm.

## BACKGROUND

¶ 2 SSM owns approximately 1,000 acres of property within the City of Sand Springs. In order to develop the property for residential and commercial use, SSM contends it is first necessary to remove rock and valuable limestone aggregate from the property. SSM applied to the Sand Springs Planning Commission for a permit to operate a quarry to remove the rock. After public hearings and the submission of substantial evidence, the Planning Commission by unanimous vote denied SSM's request. SSM appealed that decision to the Sand Springs City Council. With one abstention and no dissenting votes, the City Council denied the appeal. SSM appealed the City Council's decision to the district court. The district court affirmed the decision of the City Council.

## STANDARD OF REVIEW

¶ 3 SSM appealed to the district court. District court review of the City's decision is authorized by 12 O.S.2001 § 951(a): "A judgment rendered, or final order made, by any tribunal, board or officer exercising judicial functions, and inferior in jurisdiction to the district court, may be reversed, vacated or modified by the district court except where an appeal to some other court is provided by law." Despite SSM's position, section 951 "does not provide for a trial de novo by the district court." *In re White*, 1960 OK 188, ¶ 8, 355 P.2d 404, 406. "The proper standard of review for the district court in this case is whether errors of law were committed by the [City], and whether the [City's] findings are supported by the clear weight of the evidence." *City of Muskogee v. Grayson*, 1991 OK 101, ¶ 8, 818

P.2d 491, 493. The district court exercises original jurisdiction in reviewing such cases to determine whether zoning ordinances or the application thereof is arbitrary, capricious, or unreasonable. *City of Sand Springs v. Colliver*, 1967 OK 194, ¶ 16, 434 P.2d 186, 190, *overruled in part by O'Rourke v. City of Tulsa*, 1969 OK 112, 457 P.2d 782. That determination in the district court and in this Court depends on whether the decision of the municipality is "fairly debatable." [1]

> In reviewing the judgment of the district court, [the appellate court] must look beyond the district court's conclusions and consider the basic, physical facts appearing in the record so as to ascertain whether the zoning decision is "fairly debatable." The district court's independent conclusion as to whether there is a "fairly debatable" basis for the challenged zoning ordinance will be sustained unless it is against the clear weight of the evidence.

*Mid–Continent Life Ins. Co. v. City of Oklahoma City*, 1985 OK 41, ¶ 10, 701 P.2d 412, 414 (footnotes omitted). If zoning decisions of a municipality have a substantial relation to the public health, safety, morals or general welfare, and do not constitute an unreasonable, arbitrary exercise of police power, the municipality's judgment will not be overridden by the district court. *Id.* at ¶ 9, 701 P.2d at 413.

## ANALYSIS

¶ 4 SSM raises essentially three arguments in this appeal: (1) the district court erred in refusing to hold a hearing for the purpose of receiving additional evidence; (2) the City's use permit ordinance does not comply with state law; and (3) the denial of SSM's application was arbitrary and capricious.

## I. The District Court Was Not Permitted To Hold An Evidentiary Hearing

¶ 5 SSM argued that the district court could not make an independent conclu-

1. "The 'fairly debatable' rule initially was recognized in *Village of Euclid, Ohio v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). Therein, the United States Supreme Court stated: 'If the validity of the legislative classification for zoning purposes be fairly debatable, the legislative judgment must be allowed to control.' Oklahoma adopted this standard in *In*

*re Dawson*, [1928 OK 754], 277 P. 226." *Mackey v. City of Oklahoma City*, 1993 OK CIV APP 5, ¶ 5, 850 P.2d 353, 354. "Municipal ordinances are legislative acts of the city's governing body and have the same effect within the corporate limits as a state statute." *Vinson v. Medley*, 1987 OK 41, ¶ 5, 737 P.2d 932, 936.

sion as to whether the City's decision was fairly debatable because the record provided to the district court was incomplete. Specifically, SSM argued that complete transcriptions of all audio tapes of the relevant proceedings were not made, particularly those during the presentation of its expert witnesses on September 18, 2007. SSM attributes this to various factors including poor recordings and insufficient transcription. SSM concludes, therefore, that the district court did not have access to all of the evidence presented in support of its application.

¶ 6 First, as the City notes, SSM did not offer alternative transcriptions to the 91 transcribed pages that the City provided documenting the Planning Commission's meetings. Second, the audio tapes were provided by SSM to the district court, without objection, so that the trial judge could listen to the proceedings in addition to reviewing the Planning Commission meeting minutes. Third, the written reports of SSM's expert witnesses were provided to the district court. Fourth, SSM has pointed to no specific fact missing from the transcriptions, nor has it proposed to supplement the record with any missing testimony.

¶ 7 Although SSM does "not suggest that the parties should be permitted to introduce new or different evidence, or conduct a new trial," that is precisely what it seeks in this proposition, to present again its expert witnesses for "live testimony" before the district court. SSM invoked the district court's appellate jurisdiction pursuant to 12 O.S.2001 § 951.

The precedents and the nature of the proceedings in this jurisdiction have been that where the appeal is not taken by trial de novo, the appellate court treats the appeal in the nature of the old common-law "writ of error"; that is, the appellate court does not hear additional evidence, but confines itself to error appearing in the record, and sometimes, when the question is properly raised, as to whether or not the findings of fact of the inferior tribunal are supported by the evidence as taken and heard by it.

*In re Gruber*, 1923 OK 204, ¶ 12, 214 P. 690, 692. Further, decisions of the Oklahoma Supreme Court have demonstrated:

a clear and uninterrupted pattern of decisions ... to keep judicial intermeddling with the legislative functions of municipalities at a minimum. The only legitimate basis for interference by the courts is when the municipality has acted unreasonably, arbitrarily or in such a way as to constitute a violation of the constitutional guarantees of equal protection or due process.

*McConnell v. Town Clerk of Tipton*, 1985 OK 61, ¶ 21, 704 P.2d 479, 482. SSM has not attempted to show that any specific testimony from any of its witnesses was omitted from the record provided to the district court. It does not argue that the proceedings conducted either in the City or the district court were constitutionally defective. SSM has failed to show any error in the district court's decision to decide this matter based on the record considered by the Planning Commission and the City Council.[2]

## II. The City's Special Use Ordinance Complies With State Law

¶ 8 The City's authority to issue or deny the public use permit requested by SSM is derived from 11 O.S. Supp.2008 § 43–113.[3] A public use permit is "a permit granted by a municipal governing body, after no-

---

**2.** SSM's reliance on *Griffith Realty Co. v. City of Oklahoma City*, 1987 OK CIV APP 62, 744 P.2d 227, is unpersuasive. Although that opinion notes that the district court "heard testimony for three days," *Griffith* is procedurally distinguishable. In that case, the city appealed an injunction issued by the district court in an action originally filed in the district court. Therefore, the record in the case was made in the district court, not the city proceedings. In this case, SSM appealed the City's denial of its special use permit application to the district court. "We have held an appeal under Sec. 951 is perfected by filing in the district court a full and complete transcript of the proceedings had before the 'tribunal, board or officer exercising judicial functions,' including a transcript of the evidence. We have also held the district court sits as an appeal tribunal and its jurisdiction is limited to the consideration of the transcript and the argument of the respective attorneys thereon." *In re White*, 1960 OK 188, ¶ 8, 355 P.2d 404, 406.

**3.** For convenience, we cite to the 2008 version of the statute because in relevant part it is identical to the version of the statute in effect when SSM filed its application.

tice and a hearing and preliminary review and recommendation of a municipal planning commission, for a specific use within any zoning district." Pursuant to this authority, the City adopted a specific use permit ordinance. As SSM correctly notes, mining and quarrying necessary for removal of the rock on its property is a permitted use pursuant to this ordinance. However, as subparagraph C of the statute provides:

> The designation of a specific use as possible on the specific use list shall not constitute an authorization or an assurance that such use will be permitted. Rather, each specific use permit application shall be viewed as to its probable effect on the adjacent properties and community welfare and may be approved or denied as the findings indicate appropriate.

11 O.S. Supp.2008 § 43–113(C). Likewise, the City's ordinance provides:

> The designation of a Specific Use Permit as possible on the Specific Use Permit List does not constitute an authorization or an assurance that such use will be permitted. Rather, each Specific Use Permit application shall be valued as to its probable effect on the adjacent property and community welfare and may be approved or denied as the findings indicate appropriate.

Zoning Code of the City of Sand Springs, ch. 25, § 25.01(C).

¶ 9 Nonetheless, SSM argues that the City was required by state law to specify in its ordinance the regulations and standards governing its approval or denial of a special use permit. Title 11 O.S. Supp.2003 § 43–114(A) provides, in part: "If a municipal zoning ordinance authorizes the consideration and approval of a specific use permit pursuant to the provisions of this act, the regulations and standards upon which those decisions are made shall be specified in the ordinance." Citing section 25.01(C) of the City's zoning code, SSM contends the only standards capable of inclusion in the City's ordinance are the "probable effect on the adjacent property and community welfare." Therefore, SSM argues it was error to consider any impact of the proposed quarry on public facilities or infrastructure.

¶ 10 SSM's argument lacks support in traditional methods of statutory construction. The "probable effect" language of the City's ordinance is identical to the language in section 43–113(C), authorizing the adoption of a specific use ordinance, which provides that "each specific use permit application shall be viewed as to its probable effect on the adjacent properties and community welfare ...." If only two standards are permitted, the Legislature would have limited the available "regulations and standards" in section 43–114(A) to those specified in section 43–113(C). It did not. *See Ledbetter v. Oklahoma Alcoholic Beverage Laws Enforcement Comm'n*, 1988 OK 117, ¶ 7, 764 P.2d 172, 179 (noting that "the cardinal rule of statutory construction is to begin with consideration of the language used and courts should not read into a statute exceptions not made by the Legislature"). Although the Legislature did not grant municipalities unlimited authority to adopt regulations and standards, section 43–114(A) expressly permits consideration of certain matters.

> The standards [specified in the ordinance] shall be consistent with, and promote the intent and purpose of the comprehensive plan and/or ordinances, and promote the land use or activity so as to be compatible with adjacent uses of land, the natural environment, and the planned capacities of public services and facilities affected by the land use. The standards shall also ensure that the land use or activity is consistent with the public health, safety, and welfare of the municipality.

11 O.S. Supp.2003 § 43–114(A).

¶ 11 The City acted pursuant to this statutory authority in adopting section 25.02(C) of its zoning code:

> The City Council may, in the interest of the public welfare and to assure compliance with the intent of this ordinance and the Sand Springs Comprehensive Plan, require such development standards and operational conditions and safeguards as are indicated to be important to the welfare and protection of adjacent property and the community as a whole and be compatible with the natural environment and the

planned capacities of public services and facilities affected by the land use.

SSM does not argue that the standards considered by the City exceeded the matters described in this provision. In fact, SSM does not address this provision at all. And, SSM does not point to any authority requiring the City to confine its regulations and standards to one subparagraph of a special use ordinance. The language of the ordinance is not as limited as SSM contends. It provides that consideration of the natural environment, the capacity of public services and facilities and the welfare of the community as a whole are standards that also govern the approval or denial of special use permits. The effect of the proposed quarry on public facilities, parks, roads, utilities and infrastructure is within any reasonable construction of the regulations and standards included in the City's special use ordinance. Consequently, the ordinance satisfies State law.

### III. Evidence Supporting The District Court's Decision

¶ 12 SSM's challenge to the evidence supporting the City's decision is directed at three general areas, the effect of the quarry on adjacent property, community welfare and public facilities. SSM's property is currently located in a part of the City zoned for agricultural use. Mining and quarry operations are a special use permitted by the City's zoning code within that zoning classification. SSM argues that removing the rock in the proposed quarry is necessary for future commercial and residential development, absent which the property is worthless. SSM claimed that during its operation the quarry would provide a net economic benefit to the community and that adverse effects of quarry operations would be minimal. SSM introduced evidence supporting these claims. However, SSM's assertion that it refuted all of the opposing evidence, or that the adverse evidence concerned only the fear of potential effects rather than evidence of actual effects, is not supported by the record.

¶ 13 For example, SSM argues that because its expert concluded that quarry operations would not adversely affect the Compass Landfill, that is the only evidence in the record on this issue. SSM confuses the burden of presenting evidence with the burden of persuading the trier of fact. *See Johnson v. Bd. of Governors of Registered Dentists,* 1996 OK 41, n. 3, 913 P.2d 1339, 1350 n. 3 (Opala, J., concurring). The quarry is located near the Compass Landfill, designated by the Environmental Protection Agency as a Superfund Site. The EPA expressed concern about the effect of quarry operations on this site and requested information about the proposed operations. SSM provided a "slide show" presentation prepared by its expert witness based on a case study in New York. Based on this study, the expert concluded that the effects of blasting would extend no further than 1,000 feet from the quarry. Because the Compass Landfill is located approximately 2,000 feet away, the expert concluded the landfill would not be affected by quarry operations. The EPA asked for additional information, and SSM provided a seven page written report prepared by its expert. Even after consideration of this report, the EPA "remained concerned" that blasting operations at the quarry would compromise the integrity of efforts to secure the existing hazardous contamination at the landfill and create subsurface fissures that could promote downward offsite migration of landfill contaminates. Because the report only described the effects of blasting in general rather than with specific reference to the Compass Landfill, the EPA asked for "a site-specific evaluation and investigation of the potential effects of blasting on the area and adjacent landfill and landfill cap." SSM provided none. Therefore, even assuming, as SSM contends, that its expert report was the only evidence regarding the effects of blasting in the record, because that report did not address the effect of blasting specific to the Compass Landfill, it did not satisfy SSM's burden of presenting evidence in support of its application.

¶ 14 The City's attention to the EPA's concerns is not unwarranted. As a result of federal court litigation in which a judgment was entered against the City, the EPA established a plan requiring the City to remediate environmental hazards at the Compass Landfill site and maintain the site pursuant to the

EPA plan. If it fails to do so, the City could be required to undertake additional efforts and expense to satisfy the EPA plan.

¶ 15 Further, SSM's reliance on *In re Volunteers of America, Inc.*, 1988 OK 8, 749 P.2d 549, is misplaced.[4] That case holds that denial of a special exception to a city ordinance cannot be "based on fears 'which may or may not have a basis in fact.'" *Id.* at ¶ 12, 749 P.2d at 552. "[A]ctual evidence must be presented to show that the [special use] will be 'injurious to the neighborhood or otherwise detrimental to the public welfare.'" *Id.* Here, actual evidence was presented. For example, evidence was presented that a potential buyer decided not to pursue the purchase for fear that the quarry would be approved and his property value would diminish. SSM argues that: "One citizen's decision to no longer buy a home in this area is hardly evidence that property values will be adversely affected." Therefore, SSM concludes that the "fears" of 150 property owners that their property values would decline should be disregarded pursuant to *Volunteers* because there is no actual evidence property values will decline. In essence, SSM argues that until the quarry is in operation and is shown to adversely affect property values, the quarry must be approved. *Volunteers* requires evidence supporting a landowner's "fears" that property values will decline. It does not require evidence that property values have actually declined before a proposed use can be denied.

¶ 16 Finally, although it was the opinion of SSM's expert that blasting operations would not physically damage nearby residential structures, he also stated that there was "no doubt" that occupants would feel the vibrations caused by the proposed blasting. A home owner is qualified to testify regarding the value of the owner's property. *H.D. Youngman Contractor v. Girdner*, 1953 OK 277, ¶ 0, 262 P.2d 693, 694 (Syllabus 3). SSM cannot simply dismiss, as unsubstantiated fears, the evidence provided by 150 property owners.

¶ 17 The Planning Commission conducted eight public hearings on SSM's application, heard from thirty-five witnesses, and considered additional evidentiary material submitted by interested parties including seven expert reports. Although SSM submitted evidence that supported its application, the evidence submitted in opposition to the application was diverse and substantial. There are approximately 1,650 property owners in the affected area. Approximately 150 of those property owners expressed opposition to the application. No property owner appeared at the Planning Commission hearings in support of SSM's application. A local realtor testified concerning the negative impact the quarry would have on real estate values. Evidence from two engineers was considered showing the impact on local traffic, the life expectancy of affected roads and the cost to the City from the anticipated increase in traffic resulting from quarry operations. Further, a portion of the Arkansas River along the southeast

---

4. As the City points out, *Volunteers* involved a "special exception," as distinguished from a "variance" to a city ordinance. A "special exception use is a valid zoning mechanism that delegates to an administrative board a limited authority to allow enumerated uses, which the legislature has determined to be permissible, absent any fact or circumstance negating the presumption." *Volunteers*, 1988 OK 8 at n. 1, 749 P.2d at 550 n. 1. "A variance is a right granted by a Board of Adjustment pursuant to power vested by statute or ordinance and is a form of administrative relief from the literal import and strict application of zoning regulations. A variance extends authorization to the owner to use his property in a manner forbidden by the zoning enactment." *Nucholls v. Bd. of Adjustment of City of Tulsa*, 1977 OK 3, ¶ 10, 560 P.2d 556, 559. Consequently, a variance is a use that would otherwise violate the ordinance. "The conditions ... for the allowance of a 'variance' have no application to 'special exceptions.'" *Appeal of Moreland*, 1972 OK 87, ¶ 12, 497 P.2d 1287, 1292. SSM counters that, although deciding a case involving a special exception, the Oklahoma Supreme Court adopted a Colorado Supreme Court evidentiary principle applied in a case involving a special use permit. SSM relies only on the evidentiary principle and argues it is applicable because of the similarity between special use permits and special exceptions. Although the City correctly argues that there is a difference between the considerations required for approval of a special exception versus a special use, we find this distinction immaterial with respect to the application of the evidentiary principle applied in *Volunteers*.

border of the proposed quarry is a favorite location for bald eagles. The Executive Director of the Sutton Avian Research Center in Bartlesville, Oklahoma, expressed his concern about the adverse effects quarry operations would have on the successful eight-year, $3.5 million effort to reintroduce bald eagles to Oklahoma.

¶ 18 The quarry proposed by SSM would be in operation for 20–25 years. It would permanently and substantially change the landscape of the area. The City determined that this use would have a substantial adverse impact on adjacent property, community welfare and public facilities. The district court concluded that the City's decision was supported by substantial and competent evidence. Conducting our independent review of the record, we conclude that the decision of the City to deny SSM's application for a special use permit is fairly debatable.

## CONCLUSION

¶ 19 In its appeal to the district court of the denial of its application for a special use permit to operate a rock quarry, SSM was not entitled to present additional evidence or to a *de novo* trial of the City's action. SSM has established no constitutional infirmity in the record on which the district court decided SSM's appeal. The physical facts in this record show that the decision of the City to deny SSM's application for a special use permit is fairly debatable. The decision of the district court affirming that denial is not against the clear weight of the evidence. Therefore, we affirm the decision of the district court.

¶ 20 AFFIRMED.

WISEMAN, C.J., and BARNES, J., concur.